409 P.2d 67

Donald E. **HARRIS** and Opal Harris, his wife, Appellants,

v.

Zeph B. **CAMPBELL** and M. Frances Campbell, his wife, Appellees.*

**No. 1 CA–CIV 28.**

Court of Appeals of Arizona.

Dec. 21, 1965.

Rehearing Denied Jan. 18, 1966.

Review Denied Feb. 16, 1966.

---

* This appeal was filed with the Arizona Supreme Court and assigned that Court's Number 7597. The matter was referred to this Court pursuant to Section 12–120.23 A.R.S.

Cantor & Ely, by Herbert L. Ely, Phoenix, for appellants.

Cavanagh & O'Connor, by John P. Otto, Phoenix, for appellees.

DONOFRIO, Judge.

Opal Harris and Donald E. Harris, her husband, appellants herein and plaintiffs below, brought suit against Dr. Zeph B. Campbell and his wife, appellees and defendants below, for alleged malpractice by Dr. Campbell upon the person of Mrs. Harris. The case was tried to a jury and at the close of all the evidence the court granted a motion for a directed verdict in favor of the defendants on the grounds of failure of proof. Judgment was rendered on the verdict, and after the usual motion for a new trial was overruled this appeal was taken.

In May, 1958, Mrs. Harris a woman of 41 years of age, mother of five children, married 24 years who was suffering from a herniation of the bladder and other complications consulted the defendant, Dr. Campbell, a specialist in the field of gynecology. He recommended surgery consisting of a vaginal hysterectomy and plastic repair to cure these problems. At the time

no mention was made that surgery might affect future marital relations. The operation was performed by him on June 19, 1958, employing the Heaney technique, which is the usual procedure for this type of operation. Following the operation and up to February 1959, Mrs. Harris was treated by the defendant for granulated tissue, which was frequently cauterized. Approximately six weeks after the operation, she attempted marital relations with her husband but was unable to have them successfully.

Because of dissatisfaction Mrs. Harris quit the defendant and saw another physician who treated her for granulated tissue in the area of the operation which had lasted for about seven or eight months. This condition eventually cleared up. She continued to have a problem, however, with marital relations which was due to a shortness of the vagina. This fact forms the basis of this action. The explanation of this condition by Dr. Campbell was that it was either the onset of menopause, congenital shortness of the vagina, or granulation of tissues.

■ Plaintiff was seen by Dr. Preston Brown, a gynecologist, who testified that her condition was the result of operative and post-operative conditions. At this point Dr. Brown testified that he could not state with medical exactitude what was the cause of the condition but that there were several possibilities. He testified that during the Heaney hysterectomy process a colpoperineorrhaphy completes the operation. This is where a wall of the vagina is repaired and "the muscles of the perineum, that is, the bundle of muscles between the vagina and the rectum, are strengthened and shortened as need be".

To pinpoint the evidence and the court's ruling thereon we set out the following testimony by Dr. Brown:

"MR. ELY: Your Honor, our point is that the doctor has stated that there are a number of possibilities; that he cannot state with medical exactitude what caused it, but he does have an

opinion; but it was due to operative or post-operative conditions, if you will; and I am asking him what some of these possibilities are, Your Honor.

THE COURT: No, I believe our own Supreme Court has touched on that. You cannot deal with possibilities. You must have facts.

Objection be sustained.

Q. BY MR. ELY: Doctor, would you have testified that with medical exactitude you cannot predict what is the cause of this condition except that in your opinion it was due to the operative or postoperative conditions?

Now, Doctor, then there are only possibilities, is that correct?

A. That is correct, sir.

Q. Doctor, would you list for the Judge and the jury all the possibilities?

MR. CAVANAGH: The same objection, if the court please.

THE COURT: Objection will be sustained."

and,

"Q. BY MR. ELY: Now Doctor, of all the explanations possible—and now dealing with medical exactitude—is one of these explanations the cause of this operative or post-operative condition?

MR. CAVANAGH: Object to the form of the question as not intelligent; number two, it is asking the doctor to assume possibilities, and the Court has already ruled on that.

THE COURT: Sustained.

Q. BY MR. ELY: Doctor, you have testified that in the time that you practiced that you had never had granulation tissues postoperativewise in this type of operation lasting for seven or eight months, is that correct?

A. That's right, sir.

Q. Doctor, are there several explanations of that?

A. The explanations for prolonged granulation tissue would be very hard to assess.

One would assume that there is a raw surface persisting through which the granulation appears. Now, that failure to heal raw surface may be something inherent in the body of the patient; that there may be some defect in her healing mechanism; and that it may be that the flaps that we have described that are folded together have separated, thus leaving a larger surface from which granulation tissue would arise.

Q. Might one of those be improper on the part of the operating surgeon?

MR. CAVANAGH: If the Court please, this again is speculation. There is no proof of what whatsoever.

THE COURT: Sustained."

Appellants contend that it was error to sustain the objections to the evidence offered and with this evidence, if admitted, there is sufficient evidence to submit this case to the jury. Even though we consider the evidence we cannot agree that it would have been sufficient together with the other evidence in the case to establish a prima facie case for consideration by the jury. Even though it were possible that certain operative and post-operative conditions may have caused the condition (shortness of vagina) in Mrs. Harris there was no evidence that any of them was probable. There must have been at least a probability (as opposed to a possibility) that the operation or the treatment in connection therewith was improper.

"Before liability would attach, if the injury could have been due to several causes, any one of which might have been the sole proximate cause, it must be shown as between these causes that it was the physician's negligence that caused the injury." McBrayer v. Zordel, 127 Colo. 438, 257 P.2d 962, 965 (1953).

■ We next consider the offer of proof with reference to the performance of the colpoperineorrhaphy. The offer of proof by appellees was as follows:

"He would have further testified that another possibility that definitely cannot be ruled out in a colpoperineorrhaphy and that is an interior reconstruction of the vagina vault, and he would have said in this respect that the definite possibility would be an incorrect colpoperineorrhaphy causing taking away too much vagina which would have resulted in the shortening. And he would have further said that incorrect—improper suturing, taking away of the mucosa at any time during the operation and improper occlusion or obliteration of the vagina would have caused this condition."

The offer of proof was an offer to prove only that the possibility of an incorrect colpoperineorrhaphy could not definitely be ruled out. Again we hold the court was correct and we would apply the same reasoning. In order to establish that the operation was improperly performed and fell below the standard care required of the defendant, it is not enough that the plaintiffs cannot rule out the possibility that the operation in the respects stated was improperly performed but they must *rule in* the probability that they were.

■ In connection with Dr. Brown's testimony the further offer of proof was made:

"He would have then said there is the cause of involution of the vagina following the operation. And as to this, Your Honor, he would have testified that the skillful surgeon takes precautions on this, so to speak, using enough mucosa and not too much mucosa, that the involution does not spring below average.

He would have further testified that in all of his experience he has always been able to predict with accuracy the fact that there would not have been so much of an involution as to be shortened after the operation.

And further, Your Honor, he would have said that the more skillful physician, if there is going to be a failure would desire a failure of not enough mucosa being taken away so that you have a herniation again, so to speak, a failure of the operation as opposed to having the condition that resulted in this case, and that a negligently performed operation can cause this involution to occur."

The first part of the offer does no more than suggest that the skillful surgeon takes precautions in the amount of mucosa removed so that the involution of the vagina following the operation does not spring below average. It is followed by the offer that Dr. Brown has always been able to predict with accuracy the amount of mucosa to use so that the involution would not result in a shortening of the vagina. It is then followed with the offer that the more skillful physician if there is going to be a failure, would desire the failure of not enough mucosa being taken away so that you have a herniation again as opposed to having the condition that resulted in this case. As we view this evidence it would suggest that there are certain risks inherent in the operation and that in a given situation one physician may take a certain course in favor of one of two unsatisfactory results. See Boyce v. Brown, 51 Ariz. 416, 77 P.2d 455 (1938). The offer has also the fact that Dr. Brown's experience is that he has always been successful in his operations.

We cannot see that any of this would alter the case. It is not evidence that the appellee-doctor did something which the recognized standard of good medical practice forbids, or that he failed to do something which such standard requires.

If a physician who is a specialist in the field of medicine fails to apply the skill and learning which is required of similarly situated physicians in that community, he is guilty of malpractice. If he does something which the recognized standard of good medical practice forbids, or fails to do something which such standard requires, he is likewise guilty of malpractice. Boyce v. Brown, (supra); Butler v. Rule, 29 Ariz. 405, 242 P. 436 (1926); Stallcup v. Coscarart, 79 Ariz. 42, 282 P.2d 791 (1955). As we view it, testimony that one specialist has experienced a different result than what another specialist has experienced is not proof of the standard, nor is the fact that certain surgeons select a particular course as between two in an operation, each of which might lead to a different unsatisfactory result proof of the standard. The standard must be based on the care and skill which is exercised generally by physicians of ordinary care and skill in the community involved or similar communities.

We next consider the question of whether the court erred in refusing to admit the entire deposition of Dr. Robert T. Dean. The record discloses that Dr. Dean was duly admitted to practice in Arizona as a physician and surgeon and was engaged in the general practice of medicine. His practice involved only minor surgery and he had never performed a vaginal hysterectomy. The pertinent portions of his testimony to which objections were sustained dealt with hypothetical questions in the field of gynecology. The following is an example:

"MR. ELY: (reading)
'Question: Now, Dr. Dean, let us further assume that the same doctor provided follow-up care for four months approximately following the surgery, but that during this period this doctor, this specialist, failed to recognize that further medical procedures would be necessary to restore this woman's ability to engage in marital relations. Under these circumstances do you have an opinion which you can state with rea-

sonable medical certainty as to whether or not such failure to recognize what treatment would be necessary would fall within or below the accepted standard for medical practice in Maricopa County, Arizona?'

MR. CAVANAGH: Same objection, if the Court please. There is no showing that the doctor is qualified in gynecology and an expert, and it goes beyond the facts in this record.

THE COURT:

He hadn't qualified as to his knowledge of standard either. The objection be sustained."

Dr. Dean's testimony in the deposition was to the effect that he was not a specialist in the field of gynecology or obstetrics and had not practiced in any of the offices of the specialists in Phoenix specializing in the field of gynecology and obstetrics. He further stated that he had no direct way of knowing "what the standard of practice is for gynecologists and obstetricians in Phoenix, Arizona, or was in 1958."

Dr. Dean's association with the plaintiff consisted of a twenty to thirty minute pelvic examination performed about fifteen months after the operation in question. The trial judge sustained objections to testimony contained in the deposition concerning what conduct is below the standard of care for a gynecologist practicing in Phoenix, Arizona.

■ It has long been the rule in this jurisdiction that the competency of an expert is for the sound discretion of the trial judge. Gray v. Woods, 84 Ariz. 87, 324 P.2d 220 (1958); City of Phoenix v. Brown, 88 Ariz. 60, 352 P.2d 754 (1960); Parker v. State ex rel. Church, 89 Ariz. 124, 359 P.2d 63 (1961); Wigmore on Evidence, Volume II, Section 561, p. 641. The case at bar involves the competency of a medical expert. We recognize the problems involved in malpractice suits in obtaining expert medical testimony. In Carbone v. Warburton, 22 N.J.Super. 5, 91 A.2d 518 (1952) the New Jersey court had before it the assertion that

a person meeting prescribed educational standards of a state and licensed to practice medicine by the proper authorities, as a matter of law, automatically becomes qualified and competent to testify in any field of medicine or surgery. The weight of the testimony being for the jury to determine. The court therein stated:

"However, there is no case in New Jersey to the effect that mere possession of a license to practice medicine without more renders the holder competent to express an opinion in an action based upon damage resulting from alleged negligent care or treatment of a patient by a physician. And in our judgment the rule represented by the cases to which reference has just been made cannot be extended to such an action. The reason seems obvious. As already pointed out, in malpractice cases proof of the standards recognized and applied by the medical profession in the situation under investigation must be introduced, as well as proof of such a deviation therefrom as would warrant a determination of culpability. This evidence can come only from one who, through experience or study or both, knows the standards. Therefore, a showing of such knowledge is a prerequisite to the competency of the proffered medical witness. * * *

We find in the decisions throughout the country in medical malpractice actions frequent references to the difficulties of proof faced by a tortiously injured patient, and to the 'well known' reluctance of the members of the medical profession to testify for such a patient." 91 A.2d p. 521–522.

The court then states the rule that the qualifications of a witness to testify as an expert is in the sound discretion of the trial judge:

"Relating this rule specifically to the type of case before us, for purposes of disposition of the second phase of appellant's argument, we hold that in considering the competency of a prof-

fered expert medical witness who is a licensed physician, a trial court should have regard for the proof difficulties adverted to, and to the fundamental concept that where a right exists the law would be deficient if there were no remedy for violation of that right, and consequently should exercise his discretion liberally toward the acceptance of the qualifications. Where there is any reasonable evidence of qualification in addition to the license, he should be permitted to testify. Cross-examination will expose any weakness in or limitations on his knowledge and experience." 91 A.2d p. 522

To this same effect is 32 C.J.S., Evidence § 546(92), p. 336.

In Wigmore on Evidence, Vol. II, Sec. 569, p. 665, we find the following:

"The liberal doctrine should be insisted on that the law does not require the best possible kind of a witness, but only persons of such qualifications as the community daily and reasonably relies upon in seeking medical advice. Specialists are in most communities few and far between; the ordinary medical practitioner should be received on all matters as to which a regular medical training necessarily involves some general knowledge."

A reading of the record does not show that trial court abused its discretion in not permitting the witness to testify. We could further point out that the part excluded does not, even if admitted, show any causal relation to the injury complained of i. e., a shortening of the vagina.

"A wrong diagnosis is not actionable unless (1) it was the result of negligence, and (2) it was followed by improper treatment, to the injury of the patient." Huttner v. MacKay, 48 Wash.2d 378, 293 P.2d 766 (1956).

Appellants urge that the doctrine of res ipsa loquitur is applicable in this case. Our Supreme Court in malpractice cases before it has stated the conditions necessary for the application of the doctrine as taken from Prosser on Torts P. 295 are:

"(1) The accident (if applied to this case the condition suffered by plaintiff) must be of a kind which ordinarily does not occur in the absence of someone's negligence; (Explanation supplied).

(2) it must be caused by an agency or instrumentality within the exclusive control of defendant;

(3) it must not have been due to any voluntary action or contribution on the part of the plaintiff."

See Tiller v. Von Pohle, 72 Ariz. 11, 230 P.2d 213 (1951); Dodson v. Pohle, 73 Ariz. 186, 239 P.2d 591 (1952).

In order for the res ipsa principle to be applicable it would be necessary first to find that the condition complained of in plaintiff, which we may call the shortening of the vagina as a consequence of the operation, is of such a nature that it can be said that it ordinarily does not occur in the absence of someone's negligence. In determining whether the principle applies because of probability that the accident (condition) is of such a nature that it was the probable result of negligence, courts may rely on both common knowledge and the testimony of expert witnesses. Siverson v. Weber, 57 Cal.2d 834, 22 Cal.Rptr. 337, 372 P.2d 97 (1962); Seneris v. Haas, 45 Cal.2d 811, 291 P.2d 915 (1955), 53 A.L.R.2d 124.

It is not contended nor can we see that plaintiff's condition is an instance where a layman is able to say as a matter of common knowledge and observation that the consequences were not such as ordinarily would have followed if due care had been exercised. Here what was done lies outside the realm of the layman's experience and medical evidence is required to show not only what occurred but how and why it occurred, and therefore, we must look to the medical evidence. The medical evidence is that there is some shortening of the vagina in these types of operations; that

there is some granulation of tissue which is always present, the severity of which has some relation to the shortness of the vagina; and that the onset of menopause is also a factor. We cannot therefore hold that the evidence herein permits an inference of negligence under the doctrine of res ipsa loquitur since it cannot be said in view of the evidence that the development of the shortened vagina was more probably than not the result of negligence.

We find nothing in the record or in the assignments of error advanced by appellants to warrant reversal.

Judgment affirmed.

CAMERON, Acting C. J., and DONALD F. DAUGHTON, Superior Court Judge, concurring.

NOTE: Judge HENRY S. STEVENS having requested that he be relieved from consideration of this matter, Judge DONALD F. DAUGHTON was called to sit in his stead and participate in the determination of this decision.

---

* This appeal was filed with the Arizona Supreme Court and assigned that court's No. 8479. The matter was referred to this court pursuant to A.R.S. § 12–120.23.