481 P.2d 511

**SULPHER SPRINGS VALLEY ELECTRIC COOPERATIVE, INC., an Arizona corporation, Appellant,**

v.

**Dolores VERDUGO, Appellee.**

**No. 2 CA–CIV 895.**

Court of Appeals of Arizona, Division 2.

March 2, 1971.

Rehearing Denied March 23, 1971.
Review Denied April 27, 1971.

· Murphy, Vinson & Hazlett by John U. Vinson, Tucson, for appellant.

· William E. Netherton, Tucson for appellee.

HOWARD, Judge.

This is an action for the wrongful death of Basilio S. Verdugo which was consolidated for trial with one brought by the widow of Heraclio A. Beltran who was killed in the same accident.[1]

The deaths of Beltran and Verdugo occurred while they were attempting to install a 29′ long television antenna to the side of a home in Patagonia, Arizona. The appellant's distribution system in the area consisted of two bare wires, one "hot" and one "neutral", located approximately 28′ from the ground. The "hot" line passed the top of the porch in front of the home, overlapping it by about six inches. The neutral line was six feet further away on the same cross line.

The antenna which electrocuted the deceased, Basilio Verdugo was placed against the house by both Beltran and Verdugo. Beltran then asked Verdugo to go for a hammer and nails to secure it while he held the antenna in place. Verdugo went for the hammer and nails, but, unfortunately, the antenna began to sway. Beltran shouted to Verdugo for help but before he could reach Beltran the antenna came in contact with the "hot" wire. There was a sharp crack and Beltran fell to the ground, still in contact with the antenna. A vibrating noise and fire was coming out of Beltran's neck. Verdugo arrived on the run and grabbed Beltran. The electrical current knocked Verdugo six feet back. He got up and grabbed Beltran for the last fatal time. Again he was knocked backwards but this time forever.

The jury returned a verdict against the Beltrans but found in favor of the appellee Verdugo, in the sum of $50,000.00.[2]

Appellant appeals from the denial of a new trial and the judgment presenting the following questions which we will consider in order:

1. Was the "Good Samaritan" instruction erroneous or justified by the evidence?

2. Was the verdict in favor of Verdugo and against Beltran inconsistent?

---

1. See our opinion in the case of Heraclio A. Beltran. Sulpher Springs Valley Electric Cooperative, Inc. v. Beltran et al., 13 Ariz.App. 513, 478 P.2d 128 (1970).

2. The trial court granted a new trial to the Beltrans which we affirmed in Sulpher Springs Valley Electric Cooperative, Inc. v. Beltran, supra.

3. Was it error to allow Mrs. Beltran to testify that she had never seen a warning posted in the Patagonia Post Office?

4. Was it error to allow Dr. Nabours to express an opinion concerning safe procedures in maintaining high voltage transmission lines?

5. Was it error to preclude testimony concerning practices followed by other Arizona utilities?

6. Was it error not to allow the appellant's manager in charge of operations to testify concerning the location of the bare wire and when insulation should be used on a high voltage transmission conductor?

7. Did the trial court incorrectly exclude the REA bulletin on the basis that it was immaterial?

8. Was the instruction that the National Electrical Safety Code was a minimum requirement erroneous and a comment on the evidence?

## THE "GOOD SAMARITAN" INSTRUCTION

The trial court gave the following instruction:

"If you find that the defendant was negligent in creating a hazard that resulted in the death of Beltran and the decedent Verdugo sensing this danger acted reasonably in attempting to rescue Beltran then you may find that Verdugo was not negligent."

The appellant claims the foregoing instruction is erroneous because the "rescue doctrine" is not available to a person who contributes to the creation of a dangerous situation.

█ In Wagner v. International Ry. Co., 232 N.Y. 176, 133 N.E. 437, 19 A.L.R. 1 (1921), Judge Cardozo, in his own inimitable fashion, set forth the "rescue doctrine" when he stated: "Danger invites rescue. The cry of distress is the summons to relief." In his opinion he expresses the general rule that one who sees a person in imminent and serious peril through the negligence of another cannot be charged with

contributory negligence, as a matter of law, in risking his own life, or serious injury, in attempting to effect a rescue, provided the attempt is not recklessly or rashly made.

A myriad of cases supporting this proposition can be found in the cases annotated in 19 A.L.R., at 5–7, supplemented in 158 A.L.R., at 190–191. As indicated by the general rule, the rescuer can be guilty of contributory negligence in his decision to rescue or in the course of rescue. Thus, Restatement (Second) Torts § 472, states this rule:

"It is not contributory negligence for a plaintiff to expose himself to danger in an effort to save * * * a third person * * * from harm, unless the effect itself is an unreasonable one, or the plaintiff acts unreasonable in the course of it."

█ There is also another way in which the rescuer may be guilty of contributory negligence. That is, when the rescuer has himself brought about or helped to bring about the danger. White v. Chicago, 120 Ill.App. 607 (1905); Dulley v. Berkley, 304 S.W.2d 878 (Mo.1957); Tarnowski v. Fite, 335 Mich. 267, 55 N.W.2d 824 (1952); Atlanta & C. Air-Line Ry. Co. v. Leach, 91 Ga. 419, 17 S.E. 619, 44 Am.St.Rep. 47 (1893); Brown v. Columbia Amusement Co., 91 Mont. 174, 6 P.2d 874 (1931); Restatement (Second) Torts, § 472, comment a; 65A C.J.S. Negligence § 124, at 86.

█ Appellant's claim that the state of the evidence precludes the giving of the instruction is entirely without merit. We believe that the case of Heimke v. Munoz, 106 Ariz. 26, 470 P.2d 107 (1970), has made it abundantly clear that the question of contributory negligence is solely a jury question. Whether Verdugo was guilty of contributory negligence when he helped raise the antenna is strictly a jury question. We find no fault with the wording of the instruction itself. The fault of which appellant complains is in essence, that it does not embody its theory of contributory negligence. If appellant wanted

the court to instruct on this theory it should have offered an instruction. Having failed to do so, it is foreclosed from complaining. Patania v. Silverstone, 3 Ariz.App. 424, 415 P.2d 139 (1966). In its reply brief the appellant makes the novel argument that since this court held in the Sulpher Springs Valley Electric Cooperative, Inc. v. Beltran, supra, that the court committed fundamental error in a contributory negligence instruction and in an instruction concerning the appellant's duty of care, that, "in view of the fact that instructions are to be considered as a whole, the conclusion is inescapable that the instructions given necessarily were faulty in many respects and this alone should require this aspect of the case to be sent back for a new trial." Appellant's "inescapable" conclusion completely escapes us. The error committed by the trial court was *in favor* of the appellant. We are unable to understand how the appellant can now ask us to reverse because the trial court gave it a favorable instruction.

## INCONSISTENT VERDICTS

■ Although appearing in appellant's opening brief as a question presented for review, appellant's brief contains no supporting arguments nor authorities. We therefore deem the question abandoned. State v. Scofield, 7 Ariz.App. 307, 438 P. 2d 776 (1968).

## MRS. BELTRAN'S TESTIMONY

On direct examination Mrs. Beltran was asked the following questions and gave the following answers without objection:

"Q. Prior to December 18, 1966 [the date of the accident], at any time before then, while you were in the Patagonia area were you yourself or your husband, to your knowledge, ever given any notice of high-tension, high-voltage lines in that area?

A. No, sir.

\* \* \* \* \* \*

Q. Have you ever seen any signs up anywhere in the Patagonia area around December 18th, 1968 [sic], or before then warning of any danger of high-tension lines?

A. No, sir."

Upon cross examination of Verdugo's counsel the following questions were asked and the following answers were admitted into evidence over appellant's objection:

"Q. Mrs. Beltran, I assume there is a post office in Patagonia?

A. Yes.

Q. Have you even been in that post office?

A. Yes, sir.

Q. Was this prior to December 18, 1966?

A. Yes, sir.

Q. At any time did you ever see any warnings of high voltage lines in the post office indicating any danger existing in the area from high voltage lines?"

At this point there was an objection which was overruled. However, appellee's attorney rephrased his question:

"Q. Did you ever see any notice posted in the post office indicating high voltage lines in the area and for people to use caution or use care in connection with anything that they might do with television antennas or anything else?

A. No, sir."

■ Appellant contends this testimony was inadmissible because it consisted of negative testimony, citing Shell Oil Company v. Collar, 99 Ariz. 154, 407 P.2d 380 (1965); In re Schade's Estate, 87 Ariz. 341, 351 P.2d 173 (1960); Southern Pacific Co. v. Fisher, 35 Ariz. 87, 274 P. 779 (1929); Jeune v. Del E. Webb Const. Co., 76 Ariz. 418, 265 P.2d 1076 (1954); Cope v. Southern Pacific Co., 66 Ariz. 197, 185 P.2d 772 (1947); Dalton's Estate v. Grand Trunk Western Railroad Co., 350 Mich. 479, 87 N.W.2d 145 (1957); Udall, Arizona Law of Evidence, § 112, at 210–211 (1960).

In testing the validity of appellant's contention we note that appellant never of-

fered any evidence that notices were posted in the post office building or anywhere else, nor does appellant dispute the testimony of Mrs. Beltran in any way. It is not the rule that negative testimony has no value and is not admissible. The rule in Arizona is best expressed in Jeune v. Del E. Webb Const. Co., supra:

"The law is well settled in this state that negative testimony without sufficient predicate cannot prevail *as against direct, competent, positive testimony.* It is, of course, the general rule, supported by authorities from almost every jurisdiction including this state, that the *positive testimony* of unprejudiced, disinterested and unimpeached witnesses must prevail over purely negative testimony of the same character. [citations omitted]." 76 Ariz. at 422, 265 P.2d at 1078. (Emphasis added)

■ Mrs. Beltran did testify that she was inside the post office and never saw any notices warning of the danger of high voltage lines. Apparently it is appellant's complaint that there was no testimony to show that once inside she was in a position to see any notices.

Appellant's quibble over Mrs. Beltran's testimony does not impress us. Appellant does not contend that there was a notice in the post office. The court did not err in admitting this testimony.

THE TESTIMONY OF DR. NABOURS

Dr. Nabours, who holds a doctorate in electrical engineering was asked the following question on direct examination:

"Q. * * * and did you have an opinion as an Electrical Engineer, whether this was a reasonable and prudent construction to build a hot wire close to the house and the neutral wire away from the house?"

At this point appellant's attorney took the witness on voir dire and the following ensued:

"Q. Doctor, you never worked for a utility company or any electrical transmission company, have you?

A. No, I have not.

Q. You don't have first hand familiarity with the transmission safety requirements for high voltage?

A. I believe I do.

Q. In what respect do you have that?

A. General electric experience for around eighteen years and I've been with a good many friends who have worked directly for utility companies and I have been involved with high voltage underground electrical distribution systems although these are not overhead lines.

Q. Do you consider yourself an expert in transmission safety, electrical transmission safety?

A. I wouldn't call myself an expert in that area, no.

Q. You would consider somebody who was working directly in that field?

A. I think that is a matter of question. A man can work forty years and not—

Q. Yes.

MR. VINSON: I object. I will have to object because this witness says that he is not an expert in this particular phase and if he is not an expert he couldn't testify to it."

The objection was overruled. On appeal the appellant now claims that the question involved the province of the jury and was not the proper subject of expert opinion.

■ An appellant may not stand on one ground of objection in the trial court and urge another on the appellate level, Sampson v. Transport Indemnity Company, 1 Ariz.App. 529, 405 P.2d 467 (1965), and we will not consider whether or not the question invaded the province of the jury. Appellant also claims now, as it did in its objection, that Dr. Nabours was not qualified to answer the question because he testified he was not "an expert in transmission safety." We disagree with appellant's contention. The admission of expert testimony lies within the sound discretion of the trial court and its exercise will not be reviewed but for abuse. Carrel v. Lux, 101 Ariz. 430, 420 P.2d 564 (1966); City of

Phoenix v. Schroeder, 1 Ariz.App. 510, 405 P.2d 301 (1965); Harris v. Campbell, 2 Ariz.App. 351, 409 P.2d 67 (1965); Hinson v. Phoenix Pie Co., 3 Ariz.App. 523, 416 P.2d 202 (1966). We do not believe the trial court abused its discretion in allowing the testimony.

## PRACTICES OF OTHER UTILITIES

■ On cross-examination appellant's attorney asked Dr. Nabours if he was familiar with the practices followed by Tucson Gas & Electric Company, the Salt River Company and Arizona Public Services in the placing of the "hot wire" and the "ground wire." An objection to the question was sustained. Appellant did not pursue the question further and no offer of proof was made. Due to the lack of an offer of proof, we do not know whether the sustaining of the objection prejudiced appellant and we are therefore precluded from considering appellant's contention. Williams v. Long, 1 Ariz.App. 330, 402 P.2d 1006 (1965); Kerley Chemical Corp. of Ariz. v. Producers Cotton Oil Co. of Arizona, 2 Ariz.App. 56, 406 P.2d 258 (1965); Krek v. Briel, 3 Ariz.App. 126, 412 P.2d 301 (1966).[3]

## THE TESTIMONY OF DEFENDANT'S MANAGER

■ Appellant claims it was error for the trial court to exclude the testimony of the appellant's assistant manager of operations as to the location of the "hot wire" at the time of the accident. We are puzzled by appellant citing this as error for two reasons: (1) Appellant at no time during the trial contended and does not now contend that the "hot wire" was not

in the exact location testified to by the witnesses, and (2) there was no offer of proof. We conceive of no prejudice and appellant's contention is without merit.

■ As to whether or not the court erred in excluding the testimony of this witness as to when wires should be insulated, we also find a lack of an offer of proof and therefore will not consider the alleged error. Further, appellant admitted on oral argument that the forbidden testimony eventually came into evidence by means of another witness.

## EXCLUSION OF THE REA BULLETIN

■ REA Bulletin 168–6 requires that a utility such as appellant maintain its lines in accordance with the National Electrical Safety Code except in those instances where local codes are more stringent. Appellant contends the court erred in refusing to admit the bulletin into evidence. We do not agree.

We find it difficult to believe that the court committed prejudicial error in refusing its admission into evidence since the appellee conceded at the trial that appellant had in fact at all times in question complied with the National Electrical Safety Code.

■ Appellant argues that Udall, supra, § 18, at 248, points out that "*the* standard of care may be fixed by an administrative rule." Appellant misquotes. Udall states:

"Of course, *a* standard of care may be fixed by statute, or by administrative rules and regulations of a governmental body. In the latter case duly published and promulgated rules are admissible as evidence of *a* required standard of care." (Emphasis added).

3. Although in Tate v. Connel, 3 Ariz.App. 534, 416 P.2d 213 (1966) and State v. Taylor, 9 Ariz.App. 290, 451 P.2d 648 (1969) a bald statement is made that an offer of proof is not necessary when cross-examining, a study of these cases and their supporting authorities reveal that before the appellate court will reverse it must appear somewhere what benefit would be attained from the use of rejected evidence in order for the appellate court to determine whether there was prejudice or not. See Rhodig v. Cummings, 160 Colo. 499, 418 P.2d 521 (1966).

In essence, it is appellant's contention that since it followed the National Electrical Safety Code as required by REA Bulletin 168–6, it was conclusively absolved of any liability. We do not agree with this contention and shall discuss it further under appellant's last question.

## THE INSTRUCTION ON THE NATIONAL ELECTRICAL SAFETY CODE

■■ Over appellant's objection the court gave the following instruction:

"Compliance with the minimum requirements of the National Electrical Safety Code will not meet required standards of care and duty where other circumstances exist that require additional care in order to comply with requirements to use ordinary care in attendant circumstances. That is, a power company may be negligent despite compliance with the National Electrical Safety Code, if it is shown that something more ought to have prudently been done by the power company."

Appellant complains that the instruction is erroneous since it characterizes the National Electrical Safety Code as a "minimum requirement" whereas it is *the only* requirement. It further asserts the instruction is a comment on the evidence.

In City of Brady, Texas v. Finklea, 400 F.2d 352 (5th Cir. 1968), the United States Court of Appeals, Fifth Circuit, stated:

" * * * the Court concludes that compliance with the Code, assuming there was compliance, does not ipso facto free the City of negligence. The provisions of the Electrical Safety Code provide broad *minimum* requirements for electrical companies to follow." 400 F.2d at 356. (Emphasis added)

In Mississippi Power and Light Company v. Walters, 248 Miss. 206, 158 So.2d 2 (1963),[4] the court stated:

"The fact that the appellant's power lines in this case had a basic clearance of approximately 20 feet at the time of the plaintiff's injury, which was the minimum height prescribed by the National Electrical Safety Code for terrain accessible to vehicular traffic, did not, in our opinion, necessarily indicate that the lines were so placed that the company would have no reasonable cause to anticipate that people working near or under the wires would come in dangerous proximity to them. Proof of compliance with the standards furnished by the National Electrical Safety Code was not conclusive on the question of due care by the Power Company. Actionable negligence may exist even though the utility involved has complied with the requirements of the Safety Code.

In Galloway v. Singing River Electric Power Association, Inc., supra [247 Miss. 308, 152 So.2d 710], this Court held that a utility's compliance with the minimum safety requirements of the National Electrical Safety Code with respect to power lines relieves it of the charge of negligence per se, but compliance is not conclusive on the question of due care when the particular circumstances justify a finding of lack of due care. In its opinion in that case the Court said: 'The National Electric Safety Code contains minimum requirements and constitutes guiding principles in the construction and maintenance of electric power lines. It is not conclusive on the question of due care by the utility. Compliance with the safety code is a relevant fact on the question of due care. If appellee had failed to comply with the minimum requirements of the National

---

4. The judgment in the *Walters* case was corrected as to costs and interest, which correction has nothing to do with the proposition for which it is cited and quoted here. Mississippi Power and Light Company v. Walters, 248 Miss. 206, 160 So.2d 908 (1964).

Electric Safety Code it would probably be chargeable with negligence per se, and compliance relieves the utility of that charge. We hold that compliance with the minimum standards contained in the National Electric Safety Code is not conclusive on the question of due care when the particular circumstances justify a finding of lack of due care. Elliott v. Black River Electric Cooperative, 233 S.C. 233, 104 S.E.2d 357, 74 A.L.R.2d 907; Anno. 69 A.L.R. 127, et seq. Whether a utility is negligent despite compliance with the Safety Code is ordinarily a question for the jury. Johnson v. Monongahela Power Co. [146] W.Va. [900], 123 S.E.2d 81."

In Kingsport Utilities, Inc. v. Brown, supra, [201 Tenn. 393, 299 S.W.2d 656], a judgment for the plaintiff was upheld although it appeared that the original installation of the defendant's wires was in accordance with the National Electrical Safety Code, the court stating that the fact that the line when constructed was in accordance with the minimum standards of the electrical code did not necessarily indicate that it would be safe under changed conditions, and concluding that at least a question of fact about which reasonable men might differ was presented as to whether the utility was negligent in view of the growing nature of the area." 158 So.2d at 18–19.

We do not find the instruction to be erroneous nor do we find it to be a comment on the evidence.[5]

Affirmed.

KRUCKER, C. J., and FERNANDEZ, Judge of the Superior Court, concurring.

NOTE: Judge JAMES D. HATHAWAY having requested that he be relieved from consideration of this matter, Judge LLOYD FERNANDEZ was called to sit in his stead and participate in the determination of this decision.

5. For further support of this proposition see Cronk v. Iowa Power and Light Company, 258 Iowa 603, 138 N.W.2d 843

(1965); 29 C.J.S. Electricity § 68, at 1167.