509 P.2d 1075

**Estelle G. CAVANAGH, Appellant,**

v.

**OHIO FARMERS INSURANCE COMPANY,**
a corporation, Western Casualty and Sure-
ty Company, a corporation, United States
Fidelity and Guaranty Company, a corpora-
tion, and Maryland Casualty Company, a
corporation, Appellees.

**No. 2 CA–CIV 1197.**

Court of Appeals of Arizona,
Division 2.

May 15, 1973.

Rehearing Denied June 13, 1973.

Review Denied July 17, 1973.

Robertson, Molloy, Fickett & Jones, P. C., by Burton J. Kinerk and Michael J. Meehan, Tucson, for appellant.

Chandler, Tullar, Udall & Richmond, by D. B. Udall, Tucson, for appellee Ohio Farmers Ins. Co.

Lesher & Scruggs by D. Thompson Slutes, Tucson, for appellee Western Casualty & Surety Co.

Maupin, Wilson & Maud, by Oliver H. Maud, Phoenix, for appellee United States Fidelity and Guaranty Co.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by Robert G. Beshears, Phoenix, for appellee Maryland Casualty Co.

HATHAWAY, Chief Judge.

This is an appeal by defendant Cavanagh from a declaratory judgment decreeing that the killing of her husband by Walter Burris was intentional and therefore the insurance companies were not liable upon their policies.

On August 11, 1970, Estelle Cavanagh, wife of the victim, filed suit against Margaret Burris, administratrix of the Estate of Walter Burris, alleging that she and her children were damaged by reason of Walter Burris' homicide upon Thomas W. Cavanagh. On November 23, 1970, Ohio Farmers Insurance Company, issuer of a farmowner's policy of insureds Walter and Margaret Burris, filed a declaratory judgment action against defendants Cavanagh, Burris, Western Casualty and Surety Company, United States Fidelity and Guaranty Company and Maryland Casualty Company. The defendant insurance companies had also issued liability insurance policies, naming Walter and Margaret Burris as insureds. Plaintiff prayed for judgment declaring whether, in light of policy exclusions for bodily injury caused by intentional acts of the insured, coverage was extended to the Estate of Walter M. Burris, and if so, the relative priorities of the several policies. All insurers denied coverage based upon exclusionary provisions in their respective policies for deliberate acts of the insureds. The case was tried to a jury, resulting in the judgment which is the subject of this appeal.

The events leading up to the killing of Mr. Cavanagh are substantially without dispute. Just prior thereto, Mr. Burris had been hospitalized as a result of a horse kick which caused a blood clot in his leg. Dr. Hermon Price, Jr., a specialist in internal medicine diagnosed his condition as thrombophlebitis (an inflammation and clotting inside of the veins), and pulmonary embolism (a breaking up of the blood clots which travelled to the lungs thereby causing an insufficiency of oxygen to parts of the brain). There was some evidence that Mr. Burris might have been acting incoherently during his stay at the hospital because of the pulmonary embolism.

On the morning of the shooting, Walter Burris left the hospital over the objection of his physicians and returned to his ranch. Upon arriving he asked his foreman, Mr. Wilson, to drive him around to observe conditions on the ranch. They stopped several times to look at cattle and to check water tanks on the property, and stopped to chat with Mr. Dewitt Hummer, a friend and neighbor. Hummer testified that at the time of this conversation Mr. Burris was extremely poor in color—"just the color of a dirty sheet" and that although they had not seen each other for a long time, Mr. Burris did not talk to him and appeared disassociated from Wilson's and Hummer's conversation.

Following the conversation with Hummer, Wilson and Burris continued their drive and stopped to inspect a water tank. At this time Mr. Cavanagh came out of his house, located nearby, and approached them. Burris greeted Cavanagh and introduced him to Wilson. Thereafter Cavanagh made an accusation that one of the Burris cowboys had stolen a saddle and riding equipment from him. Burris stated that he didn't believe that the cowboy would steal, but agreed to go to the area where the men were working and find out if there was any truth to the accusation.

Wilson and Burris drove out to the area where the hands were working, Cavanagh following in another vehicle. After driving for approximately fifteen minutes, Wilson pulled the Burris vehicle to the side of the road and parked it; Cavanagh

parked five or six feet behind the Burris vehicle. Wilson then walked to the top of a nearby hill to see if he could spot the workers. Seeing no sign of them, he returned to the bottom of the hill where he found the two men having words about the theft. Wilson suggested that they leave since Burris was getting tired. As Wilson and Burris were getting into the pickup truck, Cavanagh called Burris a "lying, no good son-of-a-bitch." Burris replied, "I have never lied to you," reached into the pickup truck, got a loaded shotgun, held it to Cavanagh's head and pulled the trigger. Wilson immediately grabbed the shotgun from Burris, ejected the shells and threw it into the bed of the truck. Wilson then told Burris that they had to get an ambulance for Cavanagh, and Burris responded, "My God, what have I done?" Wilson testified that during this time Burris "looked like he was just staring off into space." Burris, later the same day, took his own life.

The principal issue in the lower court was whether Mr. Burris had committed this act while in control of his senses. The appeal involves numerous claims of error.

## WAS THE DISTRIBUTION OF PEREMPTORY CHALLENGES PROPER?

Appellant argues that distribution of peremptory challenges to the jury between plaintiffs and defendants was improper under Rule 47(e), as amended, Arizona Rules of Civil Procedure, and therefore prejudicial error was committed by the trial court. Rule 47(e), Ariz.Rules Civ.Proc., 16 A.R. S., provides:

"Each side shall be entitled to four peremptory challenges. For the purposes of this rule, each case, whether a single action or two or more actions consolidated or consolidated for trial, shall be treated as having only two sides. Whenever it appears that two or more parties on a side have an adverse or hostile interest, the court may allow additional peremptory challenges, but each side shall have an equal number of peremptory challenges. If the parties on a side are unable to agree upon the allocation of peremptory challenges among themselves, the allocation shall be determined by the court. Any individual party, without consent of any other party, may challenge for cause."

The amendment changes the prior rule which required all parties on a particular side to join in each of four peremptory challenges, and made no provision for adverse interests on the same side of the case. The purpose of the amendment has been commented upon in the State Bar Committee Note (1968) to Rule 47(e):

"The provision that each case shall be treated as having only two sides is intended to forestall any contention that there may be more than two sides because of cross-claims or third party claims. . . ."

In its application of Rule 47(e), the lower court ruled that the defendants were entitled to six peremptory challenges, three to defendants Cavanagh and Burris and three to the defendant insurance companies; and, in accordance with the rule the plaintiff was also given six. The appellant claims that there was an improper division of sides because the sides were actually the insurance companies against Cavanagh and Burris even though the nominal division of plaintiffs and defendants was otherwise.[1]

Appellant concedes that Rule 47(e) allows only two sides to a controversy but argues that "sides" does not refer to plaintiff and defendant but rather to sides of the *actual controversy*. She would have us interpret Rule 47(e) to read that where the actual controversy is known to be other than between the designated plaintiff and defendant, the sides should be identified in accordance with the actual conflict. Appellant points out that by ruling that plaintiff-insurer was in opposition to the de-

---

1. This contention is based on the unanimity in proving that the act was intentional.

fendant-insurers who were actually in opposition to the individual defendants, the insurance companies were provided with nine peremptory challenges while the individual defendants were provided with only three.

The exercise of peremptory challenges in civil cases is granted by Rule 47(e), and the rule controls. Moran v. Jones, 75 Ariz. 175, 253 P.2d 891 (1953). The meaning attributed to the word "side" is the controlling factor in determining whether the trial court properly granted the peremptory challenges. In Moran v. Jones, supra, the court used "side" interchangeably with plaintiff and defendant quoting from Corpus Juris Secundum as follows:

". . . where there are several plaintiffs or several defendants, . . . *all on one side* constitute but one party and are entitled only to the number of peremptory challenges allowed a single plaintiff or defendant; . . . ." 75 Ariz. at 178, 253 P.2d at 892 (Emphasis added)

The court further noted the foregoing to be true in spite of several defendants or several plaintiffs being antagonistic or adverse in their positions.

The rule limits each case to two sides which necessarily are the plaintiffs and the defendants. No provision is made for the situation where the plaintiffs and some defendants are not adverse. The rule does provide for additional peremptory challenges where two or more parties on a side "have an adverse or hostile interest . . . but each side shall have an equal number of peremptory challenges." We are of the opinion that the trial court followed the rule and appellant's claim of error is without merit.

## WAS CHARLES WILSON'S STATEMENT AFTER THE SHOOTING PROPERLY EXCLUDED AS HEARSAY?

Upon arrival at the ranch house, 15 to 20 minutes after the shooting, Mr. Wilson made a statement to Jack Kabelli, to the effect, "Oh, my God, Walt just shot a man. He doesn't know what he is doing." The appellant contends this statement was admissible under the "excited utterance" exception to the hearsay rule, because at the time Wilson made the statement he was "distraught, crying and under the influence of the horrifying shooting." The trial court did not agree. The requirements for the "excited utterance" exception are as follows:

1. There must be a startling event.
2. The words must be spoken soon after the event so as not to give the speaker time to fabricate.
3. The words spoken must relate to the startling event. State v. McLain, 74 Ariz. 132, 135, 245 P.2d 278, 281 (1952).

Requirements one and three having been met, we will consider only the second. The evidence discloses that Mr. Wilson may have had time to fabricate, and we find no abuse of the trial court's discretion in the exclusion of the testimony. Musgrave v. Karis, 63 Ariz. 417, 163 P.2d 278 (1945). The following evidence indicates that Wilson did function reflectively. Immediately after the shooting he ejected all the cartridges from the shotgun and threw it in the back of the pickup. He then told Burris, "Come on, Walt, we've got to get a doctor and an ambulance for the man." Wilson helped Burris into the pickup and discussed the feasibility of flight to Mexico as they drove away. Near the corrals, Wilson got out and had the presence of mind to remove the other gun from the front of the pickup. This evidence lends support to the trial court's ruling.

## WAS IT ERROR TO PERMIT DR. HARRISON TO TESTIFY, THAT BURRIS HAD REMAINED AT THE RANCH FOR A HALF-HOUR AFTER THE SHOOTING THUS CONRADICTING THE TESTIMONY OF WILSON, THE ONLY EYEWITNESS?

Over "hearsay" objection, Dr. Harrison, the treating physician, was allowed

to testify that Wilson had told him that Burris had remained at the ranch house about 30 to 40 minutes before Burris drove off and killed himself. Appellees assert that Dr. Harrison's testimony was introduced to impeach Wilson and therefore was not hearsay. Appellant contends that this was not proper impeachment because no warning question was asked and therefore no proper foundation was laid. This objection was not presented in the trial court, however, and the point is not preserved for review on appeal.

■ Appellant further attacks this as improper impeachment testimony because Wilson's testimony was initially introduced, by way of deposition, by Ohio Farmers Insurance Company. Ohio Farmers also introduced Dr. Harrison's impeaching testimony, therefore appellant asserts error because a party is not allowed to impeach his own witness. We have reviewed the record and find that appellant's objection ("No foundation") was not sufficiently specific to preserve the matter for appellate consideration. State v. Hoffman, 78 Ariz. 319, 279 P.2d 898 (1955); Tucson Fed. Sav. & Loan Ass'n v. Aetna Inv. Corp., 74 Ariz. 163, 245 P.2d 423 (1952).

WAS IT ERROR TO ADMIT TESTIMONY RELATING TO A TELEPHONE CALL FROM A PERSON PURPORTING TO BE WALTER BURRIS?

Evidence of a telephone conversation was introduced to show Mr. Burris' propensity for violence. Over objection, Mrs. Dyer, a Motorola receptionist, was allowed to testify that she had received a telephone call from a person purporting to be Walter Burris who said that Newby and Creighton (Motorola executives) were crooks and that he (Burris) was going to blow up Motorola if they didn't get rid of them. Mrs.

Dyer acknowledged that she did not know Walter Burris, had never met him and would not know his voice.

■ Appellant contends that error was committed because the caller's voice was not properly identified. One way of authenticating a phone call is to show that the witness recognized the caller's voice, however, the identity of the speaker may also be established by circumstantial evidence. United States v. Lo Bue, 180 F. Supp. 955 (S.D.N.Y.1960); McCormick on Evidence § 193 (1954); 31A C.J.S. Evidence § 188 (1964).

In United States v. Lo Bue, supra, the court dealt with a like argument directed to the inadmissibility of a telephone conversation for lack of identification of the caller's voice as follows:

"The requirement of direct recognition of the voice is not, however, an inexorable or mechanical rule.

Circumstantial evidence may be sufficient to identity the speaker. Indeed, 'the substance of the communication may itself be enough to make them prima facie proof.' (Citation omitted)

Where the foundation of proof consists of an aggregate of circumstances establishing that it was extremely remote or highly improbable that anyone other than the defendant was the declarant, there is sufficient proof of the defendant's identity as the speaker." 180 F.Supp. at 956.

■ The challenged telephone conversation reveals circumstances [2] of which most likely only Burris would be aware. Authentication of Burris' identity would appear to have been sufficiently established for submission to the jury because of his intimate knowledge of the circumstances and surrounding matters about which he spoke. See, Gutowsky v. Halliburton Oil Well Cementing Co., 287 P.2d 204 (Okl.

2. The calls received by Mrs. Dyer were in continuing sequence and of the same subject matter, the caller always identifying himself as Walter Burris. The conversations all involved Mr. Burris, his ranch and Motorola employees, Messrs. Creigh- ton and Newby. The speaker intimately knew of the circumstances surrounding the situation about which he spoke. Moreover, on a subsequent call the caller apologized to Mrs. Dyer for the prior calls.

1955). The weight to be given to this evidence, of course, was for the jury. As was stated in Carbo v. United States, 314 F.2d 718 (9th Cir. 1963):

". . . Connection between a telephone call and the caller may be established circumstantially. The issue for the trial judge in determining whether the required foundation for the introduction of the evidence has been established is whether the proof is such that the jury, acting as reasonable men, could find its authorship as claimed by the proponent. The scope of appellate review upon this issue is confined to determining whether the admission constituted abuse of judicial discretion in determining that a prima facie case has been made out." 314 F.2d at 743.

It appears that the trial court was justified in submitting this evidence to the jury.

## WAS THE INTRODUCTION OF A DEPOSITION TAKEN IN A PRIOR ACTION PREJUDICIAL ERROR?

■ At trial, the appellees were permitted to read from a deposition taken in a prior lawsuit, instituted by Joe Maierhouser against Walter Burris, for an alleged assault. Appellant contends that Ariz. Rules Civ.Proc. 43(e) precludes admission of the deposition in the case before us and asserts prejudicial error from its admission.

We have reviewed the record with respect to this allegation of error and find that the deposition was *not* introduced against appellant Cavanagh but only against defendant Burris. It is without dispute that evidence properly offered against one of multiple parties must ordinarily be admitted, although it would be inadmissible and prejudicial against another party.. State v. Sanchez, 59 Ariz. 426, 129 P.2d 923 (1942); Udall, Ariz. Law of Evidence, § 11 (1960).

Furthermore, the court instructed the jury to consider the evidence only as to defendant Burris and to disregard it as to defendant Cavanagh. Appellant therefore has no basis for complaint since her objection was sustained and the jury instructed accordingly.

## WAS DR. HARRISON'S EXPERT TESTIMONY PROPERLY ADMITTED INTO EVIDENCE?

Dr. Harrison, Walter Burris' treating physician prior to Burris' last hospitalization, was called by appellees as an expert medical witness. He expressed his opinion after the following question:

"Q. Did you form any opinion, Doctor, based upon your association with Mr. Burris, based upon your pre-hospital treatment of him, based upon your observation of him in the hospital *as well as the sundry reports you received in the course of the hospitalization,* based upon your observations with him in the hospital, based upon you conversations with him in the hospital, based upon the reports that you received relative to his condition and his activities while in the hospital as well as the treatment that he received, did you have an occasion to form an opinion as to whether or not he suffered from a condition, that condition which was previously referred to as an acute brain syndrome?" (Emphasis added.)

Objection was made that insufficient foundation had been laid. The objection was overruled and Dr. Harrison gave his opinion that Mr. Burris did not suffer from an acute brain syndrome. Appellant now argues that a physician may not render an opinion based upon hearsay statements except history given by the patient. Udall, Arizona Law of Evidence § 24, p. 47 (1960). This, she contends, would rule out an opinion based upon "sundry reports received in the course of hospitalization."

■ Appellees respond, and we agree, that appellant cannot object on the basis of foundational deficiency in the trial court and thereafter urge hearsay error on appeal. Sulpher Springs Valley Electrical Coop, Inc. v. Verdugo, 14 Ariz.App. 141, 481 P.2d 511 (1971); Sampson v. Transport Indemn. Co., 1 Ariz.App. 529, 405 P.

2d 467 (1965); Udall, Ariz. Law of Evidence, § 12, p. 28 (1960). Moreover, the hospital records in question had already been admitted into evidence. Appellant made no effort to point out to the trial court which reports she found objectionable. We conclude that this question presented on appeal is without merit.

## WAS IT ERROR FOR THE TRIAL COURT TO HAVE REFUSED TO GIVE APPELLANT'S INSTRUCTION NUMBER 3?

■ We decline to discuss this contention because appellant has failed to preserve her right to appellate consideration. She made the following objection upon the court's refusal to give instruction number three:

"... that the Court's refusal to give Defendant Cavanagh's number 3, we would object to the Court's refusal in that regard."

Rule 51(a), Ariz.Rules of Civil Proc., requires that grounds for objection to instructions be stated with specificity. General Petroleum Corp. v. Barker, 77 Ariz. 235, 269 P.2d 729 (1954); City of Glendale v. Bradshaw, 16 Ariz.App. 348, 493 P.2d 515 (1972).

## WAS AN INSTRUCTION CONCERNING PRESUMPTION OF INTENT ERRONEOUS?

■ Appellant next alleges that it was error to instruct the jury that one is presumed to intend the natural and probable consequences of his act, because there was evidence to the contrary. Specifically she relies upon Seiler v. Whiting, 52 Ariz. 542, 548–549, 84 P.2d 452, 454–455 (1938).

"... In truth there is but one type of presumption in the strict legal meaning of the word, and that is merely a general rule of law that under some circumstances, *in the absence of any evidence to the contrary,* a jury is compelled to reach a certain conclusion of fact. But a presumption so declared by the law is only raised by the absence of any real evidence as to the existence of the ultimate fact in question. It is not in and of itself evidence, but merely an arbitrary rule imposed by the law, to be applied in the absence of evidence, and whenever evidence contradicting the presumption is offered the latter disappears entirely, and the triers of fact are bound to follow the usual rules of evidence in reaching their ultimate conclusion of fact. As was once said, 'Presumptions may be looked on as the bats of the law, flitting in the twilight, but disappearing in the sunshine of actual facts.' Mockowik v. Kansas City, etc., R. Co., 196 Mo. 550, 94 S.W. 256, 262. The Supreme Court of South Dakota, in Peters v. Lohr, 24 S.D. 605, 124 N.W. 853, in discussing this question, used the following language (p. 855):"

Appellant's reliance upon Seiler v. Whiting, supra, is misplaced because we are not dealing here with a presumption but rather with an inference. These inferences have been distinguished from presumptions by calling them presumptions of fact. Stenberg v. Buckley, 245 Iowa 622, 61 N.W.2d 452 (1953); Wyatt v. Baughman, 121 Utah 98, 239 P.2d 193 (1951). The inference that one intends the natural and probable consequences of his act is founded upon a logical mental process, that when a person voluntarily commits an act he usually intends the natural conseqeunces thereof. See, State v. Preis, 89 Ariz. 336, 362 P.2d 660 (1961). This inference merely advises the jurors that they are allowed to use circumstantial evidence (the commission of the act) to determine whether the consequences were intended. McCormick, Evidence § 308 (1954). The instruction complained of in this case was proper especially in light of the fact that it was given in conditional terms.[3]

---

3. "You are instructed that the law presumes that one is in command of mental facilities and intends the natural and probable consequences of his act. Such presumption is rebuttable, however. You may consider such presumption and give it such weight as you deem appropriate."

## WAS APPELLEES' ARGUMENT TO THE JURY SUCH THAT THE VERDICT WAS THE RESULT OF PASSION OR PREJUDICE?

The appellant argues that reversible error was committed at closing argument when counsel for one of the appellees argued that the intentional act exclusion was written into policies in order to reduce premium rates charged to the public.

Here counsel did not ask the jurors to consider the effect on their own insurance premium. The statements were explanatory of the application to be given to the exclusion clause in the insurance policy. It is not error to argue insurance liability when the policy itself is relevant to the facts of the case. Arizona-Hercules Copper Co. v. Crenshaw, 21 Ariz. 15, 184 P. 996 (1919).

The other assignments of error with respect to the sufficiency of the evidence have been considered and we find them without merit.

Affirmed.

KRUCKER and HOWARD, JJ., concur.