JERRY W. WHITEHURST v. DR. DONALD P. BOEHM

No. 783SC775

(Filed 19 June 1979)

1. **Physicians, Surgeons and Allied Professions § 11.1— podiatrist—standard of care—showing by orthopedic surgeon improper**

   In malpractice cases the applicable standard of care for podiatrists and other "allied occupations" to medicine must be established by other practitioners in the particular field of practice or by other expert witnesses equally familiar and competent to testify with respect to that limited field of practice; therefore, the standard of care required of a podiatrist could not be established through testimony of an orthopedic surgeon who was not familiar with the practice of podiatry.

2. **Physicians, Surgeons and Allied Professions § 15.1— malpractice of podiatrist alleged—expert testimony by orthopedic surgeon—exclusion proper**

   The trial court in an action for malpractice did not err in excluding an orthopedic surgeon's response to a hypothetical question concerning a podiatrist's failure to use a tourniquet since the standard of care required of the podiatrist could only be established by other podiatrists and since all the evidence tended to show that defendant podiatrist did use a tourniquet.

3. **Physicians, Surgeons and Allied Professions § 20.2— malpractice of podiatrist—conflicting instructions—error favorable to plaintiff**

   In a malpractice action brought against defendant podiatrist, the trial court erred in giving conflicting instructions that the standard of care of a podiatrist must be established by other podiatrists and that it must be established by an orthopedic surgeon, but such error was favorable to plaintiff.

APPEAL by plaintiff from *Bruce, Judge.* Judgment entered 5 April 1978 in Superior Court, PITT County. Heard in the Court of Appeals 3 May 1979.

Plaintiff instituted this action against defendant, Dr. Donald P. Boehm, alleging that the defendant was negligent, in that he failed to properly diagnose the plaintiff's foot condition, that he recommended surgery when in fact surgery was not needed, that the surgery on plaintiff's foot was done in a negligent manner, and that the defendant failed to take proper postoperative care of the wound. Defendant admitted performing the operation, but denied all allegations of negligence. Defendant is a podiatrist.

At trial, plaintiff presented evidence which tended to show that he developed a pain in his left foot and had several appointments with the defendant in the summer of 1975. Defendant diagnosed plaintiff's problem as a Morton's neuroma (scar tissue on a nerve) and indicated that the neuroma tissue could be removed by minor surgery in defendant's office.

On 19 September 1975, the surgery was performed, and defendant again assured the plaintiff that the surgical procedure was "quite simple." Local anesthesia was administered to the plaintiff and a "rubber-band type" tourniquet was used on plaintiff's calf during the operation. An incision was made between the third and fourth toes on the top of the plaintiff's foot. The surgery became more complicated than anticipated. The plaintiff's foot bled profusely and the pain grew more severe. Plaintiff overheard the defendant tell his nurse that "[i]t was turning out to be a bigger problem than it looked like."

After the operation, plaintiff left defendant's office with his foot in a bandage and wearing a special canvas shoe. At this time, plaintiff was not given any instructions, either verbal or written. One half hour after the surgery, blood had saturated the bandage and the pain was intensifying. Plaintiff was unable to return to work as a result. Plaintiff made several return visits to the defendant on 22 September 1975 and 24 September 1975, but the defendant refused to change the original bandage. It was at these visits that the defendant provided the plaintiff with written instructions.

Plaintiff finally removed the bandage himself on or about 26 September 1975. His foot was swollen and infected. Plaintiff visited the defendant on two more subsequent occasions but defendant did not provide any medication and reassured the plaintiff that everything was alright with his foot. On the advice of a

nurse at plaintiff's place of employment, plaintiff visited his regular physician, Dr. Woodworth, on 16 October 1975. Dr. Woodworth referred the plaintiff to Dr. Crisp, an orthopedic surgeon. After waiting a year for the infection to clear, plaintiff underwent corrective surgery at Duke University Medical Center, with orthopedic surgeon Dr. McCollum operating on the underside of the plaintiff's left foot. This operation relieved the most severe areas of pain, however, the plaintiff still could not move his toes on the left foot.

Dr. Woodworth testified that his examination of plaintiff's foot revealed that the foot needed further attention and that the foot was not healing properly. He subsequently referred the plaintiff to Dr. McCollum.

Dr. McCollum testified that his diagnosis of plaintiff's problem was a neuroma and that he operated in November 1976 under a general anesthetic with a tourniquet and removed a neuroma. The defendant's inadequate dissection in the first operation led to a new neuroma which necessitated Dr. McCollum's corrective surgery. Dr. McCollum testified that the plaintiff still suffered a permanent partial disability of 10% of his foot. Based upon the numbness and stiffness of the third toe, plaintiff's inability to stand longer than two hours without severe pain and his inability to engage in activities such as tennis, Dr. McCollum surmised that plaintiff's disability prior to the second operation was 25% of the foot.

Defendant testified that he diagnosed the plaintiff's problem as two neuromas, but elected to remove only one of them as a result of the risk involved. He operated on the plaintiff on 19 September 1975. After the surgery, he gave the plaintiff oral and written instructions. On 27 September 1975, the defendant changed the bandage and was "satisfied with the progress that had been made since the operation." The defendant further testified that his incision (between the second and third toes) was made in a different area than that of Dr. McCollum's (between the third and fourth toes) and that Dr. McCollum's surgery was therefore not corrective.

Defendant's nurse testified that she gave the plaintiff's wife written and oral instructions immediately after the surgery and

that the defendant changed plaintiff's bandages on several postoperative visits.

The jury reached a verdict in favor of defendant, finding no negligence. Plaintiff appeals.

*James, Hite, Cavendish & Blount, by Robert D. Rouse III, for plaintiff appellant.*

*Farris, Thomas & Farris, by Robert A. Farris and Thomas J. Farris, for defendant appellee.*

CARLTON, Judge.

[1] The plaintiff first contends that the trial court erred in excluding the testimony of Dr. McCollum, an orthopedic surgeon, "concerning the standard of care that should have been present in the treatment of the plaintiff." The assigned error raises the primary question for determination on this appeal: In an action for malpractice, what is the proper applicable standard of care for one engaged in the practice of podiatry?

On direct examination of Dr. McCollum, objections by the defendant to the following questions and others similarly worded were sustained by the court:

> Q. Now, would the use of the tourniquet, as you have described, be within the standards of professional competence and care customarily similar in the communities here in North Carolina, and Durham? Is this general standard practice?

> Q. Now, would that be the normal procedure that would be exercised here at Duke University Medical Center?

> Q. If you had a patient that was coming to you for this particular type of condition, which was described as one that Mr. Whitehurst had, what generally would you do in the way of informing that particular patient about the risk incident to surgery and the alternatives for treatment and this type of thing?

The burden of proof is on the plaintiff in a medical malpractice case to establish the applicable standard of care required of practitioners in defendant's field of practice. *See Price v. Neyland,* 115 U.S. App. D.C. 355, 320 F. 2d 674 (1963). A physician

in North Carolina, is held to the standard of professional competence and care customary in similar communities among physicians engaged in his field of practice. *See Thompson v. Lockert,* 34 N.C. App. 1, 237 S.E. 2d 259 (1977); *Dickens v. Everhart,* 284 N.C. 95, 199 S.E. 2d 440 (1973). The same rules that govern the duty and liability of physicians and surgeons in the performance of professional services are applicable to practitioners of the "kindred branches of the healing profession" and to practitioners in allied health fields. 70 C.J.S., Physicians and Surgeons, § 41, p. 946. In introducing the deposition of Dr. McCollum, plaintiff was attempting to meet his burden of proof. Moreover, he was attempting to establish for the practice of podiatry, the same standard of care required of orthopedic surgeons. Based on a review of the record, we agree with plaintiff that podiatrists consider themselves even more qualified than orthopedic surgeons to perform surgery of the foot. However, we do not agree with plaintiff's interpretation of prevailing law. The standard of care required of a podiatrist cannot be established through testimony of an orthopedic surgeon who is not familiar with the practice of podiatry; it can only be established by the testimony of another podiatrist or one equally familiar with that field of practice.

The practice of podiatry is defined in G.S. § 90-202.2 as "the surgical or medical or mechanical treatment of all ailments of the human foot, except the amputation of the foot or toes or the administration of an anesthetic other than local and except the correction of clubfoot deformity and triple arthrodesis." The term podiatry is often used interchangeably with the term chiropody. The definition of podiatry, by its own national organization, is as follows: Chiropody-podiatry is that specialty of medical practice which includes the diagnosis and/or the medical, surgical, mechanical, physical and adjunctive treatment of the diseases, injuries and defects of the human foot. *Lawyers' Medical Cyclopedia,* Vol. 1, § 1.18, p. 33. There is an American Podiatry Association and there are schools of podiatric medicine across the country. Podiatrists are not members of the American Medical Association and the practice of podiatry is closely regulated by state statutes. *See* G.S., Chap. 90, Art. 12A.

The record discloses that the defendant had graduated from the Illinois College of Podiatric Medicine and was licensed to practice podiatry in North Carolina.

While there are no North Carolina cases on the applicable standard of care required of podiatrists, the majority view is that a podiatrist must exercise that degree of ordinary skill and care which is commonly exercised by other podiatrists in the same locality under similar circumstances. He is not bound to possess and exercise the degree of care and skill required of an ordinary physician or surgeon. *Anno:* 80 A.L.R. 2d 1278; *Whyte v. American Motorists,* 122 So. 2d 297 (La. Ct. App. 1960).

Accordingly, proof of negligence, by establishing the requisite standard of care, is reserved for competent practitioners of the defendant's own school of medicine, who alone can testify as to the teachings of that school and the defendant's conformity thereto in the treatment of the patient. *Anno:* 85 A.L.R. 2d 1022; Am. Jur. 2d, Physicians and Surgeons, § 205, p. 340; *Ferguson v. Gonyaw,* 64 Mich. App. 685, 236 N.W. 2d 543 (1975); *Binns v. Schoenbrun,* 81 N.M. 489, 468 P. 2d 890 (1970); *Harris v. Campbell,* 2 Ariz. App. 351, 409 P. 2d 67 (1966).

> A school of medicine relates to the system of diagnosis and treatment. While the law recognizes that there are different schools of medicine, it does not favor, or give exclusive recognition to, any particular school or system of medicine, as against the others. *When a patient selects a practitioner of a recognized school of treatment he adopts the kind of treatment common to that school, or, as otherwise stated, he is presumed to elect that the treatment shall be according to the system or school of medicine to which such practitioner belongs.* The question whether or not a practitioner in his treatment of the case exercised the requisite degree of care, skill, and diligence is to be tested by the general rules and principles of the particular school of medicine which he follows, and not by those of other schools, since he is only under the duty of exercising the degree of skill and care ordinarily exercised by practitioners of his school. (Emphasis added.) 70 C.J.S., Physicians and Surgeons, § 44, p. 953.

North Carolina adheres to the majority view concerning the qualification of experts attempting to establish the standard of care in malpractice cases. In *Hardy v. Dahl,* 210 N.C. 530, 187 S.E. 788 (1936), the plaintiff sought damages for the wrongful death of his son, alleging negligence on the part of the treating defendant,

a naturopath. Our Supreme Court discussed the applicable standard of care for a naturopath, saying:

> In determining liability in a civil action for damages on the ground of negligence, the defendant was not required to possess the highest technical skill nor the wide scientific knowledge and learning of the well recognized schools of medicine and surgery, nor to exercise the utmost degree of care, *but only to exercise that degree of care, knowledge, and skill ordinarily possessed by members of his school of practice,* and to use reasonable care and diligence in the exercise of that skill and knowledge and in the exercise of his judgment in the treatment he holds himself out to practice. (Emphasis added.) *Id.* at 533, 534, 187 S.E. 788 at 790.

Likewise, the standard of care for dentists in malpractice actions is established by other dentists, *Hazelwood v. Adams*, 245 N.C. 398, 95 S.E. 2d 917 (1957); *Grier v. Phillips*, 230 N.C. 672, 55 S.E. 2d 485 (1949) and the standard for medical doctors is established by other medical doctors similarly situated. *Hunt v. Bradshaw*, 242 N.C. 517, 88 S.E. 2d 762 (1955); *Jackson v. Sanitarium*, 234 N.C. 222, 67 S.E. 2d 57 (1951).

Our review of the applicable statutes and the record indicates that the practice of podiatry is a narrowly restricted one. This allied health profession is not at all comparable with the practice of medicine and surgery. The educational requirements for a podiatrist are less demanding than those for physicians and surgeons. *See* G.S. 90-202.5. The practice is limited to correcting conditions of the foot. It would be highly unlikely that a practitioner in one of these fields would be familiar with the training and standards of the other. Indeed, Dr. McCollum testified that he was not familiar with the standards of licensing with respect to podiatrists, nor with their standards for professional care and that all his opinions were based on standards for physicians and surgeons.

Arguably, the layman can urge that one engaged in the healing arts should be held accountable to the highest degree of medical care. It is obviously difficult for a layman to distinguish between those who proudly call themselves "doctor." Indeed, the defendant and his witness, another podiatrist, testified that they were more qualified than an orthopedic surgeon to perform

surgery of the foot. There is no evidence, however, that defendant, prior to the surgery, ever held himself out to be more than he was—a podiatrist. Even a general medical practitioner is not held to the higher standards of the specialist. 70 C.J.S., Physicians and Surgeons, § 41, p. 946.

Chapter 90 of our General Statutes is entitled "Medicine and Allied Occupations." It sets forth licensing and other standards for the practice of medicine, dentistry, pharmacy, optometry, chiropractic, nursing, podiatry, embalming, dental hygiene, dispensing optician, psychology and speech and language pathology and audiology. Podiatry is obviously an "allied occupation" (to medicine) in the contemplation of our state law. Plaintiff elected to undergo foot surgery by one other than a pure medical or surgical practitioner. Under prevailing law, he cannot now complain that the mode of treatment employed by one he voluntarily selected was less than the most competent available in the world of medicine. It is obviously a function of the legislature, not the courts, to determine if those who carry the title "doctor" should be limited to those engaged in the pure practice of medicine and surgery, or to take other steps to insure that the innocent layman knows the limitations of those engaged in the medically "allied occupations."

We hold that, in malpractice cases, the applicable standard of care for podiatrists and other "allied occupations" to medicine must be established by other practitioners in the particular field of practice or by other expert witnesses *equally* familiar and competent to testify with respect to that limited field of practice.

We therefore dismiss plaintiff's contention that an orthopedic surgeon is competent to establish the standard of care for a doctor of podiatry. Objections made by defendant to this line of questioning were properly sustained by the trial court.

[2] Plaintiff next assigns as error the exclusion of Dr. McCollum's response to a hypothetical question formulated by plaintiff's counsel on direct examination. The questioning was as follows:

Q. Well, assuming for the moment that the jury should find from the evidence and by its greater weight that when Dr. Donald P. Boehm performed the original surgical pro-

cedure on Mr. Whitehurst *that he did not use a tourniquet,* do you have an opinion satisfactory to yourself, based upon competent medical authority, as to whether or not this would have obscured his vision at the site of the operation or the exact location that the operation was performed? (Emphasis added.)

The trial court was proper in sustaining objections to this question for two reasons. As noted above, the standard of care can only be established by "members of his [podiatry] school of practice." To allow Dr. McCollum's response to this question calling for the opinion of an orthopedic surgeon concerning a podiatrist's method of treatment would be contrary to prevailing law.

Even assuming the question were not objectionable for the aforementioned reason, it would still be improper for another reason. The use of hypothetical questions is an accepted method of examining an expert witness. However, an important *caveat* in framing a hypothetical question is that "only such facts as are in evidence or such as the jury will be justified in inferring from the evidence" are to be incorporated in the question. 1 Stansbury, N.C. Evidence, § 137, p. 452 (Brandis rev. ed. 1973); *Keith v. Gas Co.,* 266 N.C. 119, 146 S.E. 2d 7 (1966). In the case *sub judice,* there was no evidence that the defendant did not use a tourniquet during the plaintiff's operation. On the contrary, all the evidence, including the plaintiff's own testimony, tended to show that the defendant did in fact use a tourniquet. This assignment of error is overruled.

The plaintiff next contends that the trial court committed error in its instructions to the jury. Plaintiff argues that the standard of care, defined and explained in terms of "others similarly situated" in the instructions, should have encompassed "specialists dealing with orthopedic surgery of the foot." We do not agree with this contention in light of our holding as to the applicable standard of care.

[3]   The plaintiff further contends that the court's instructions were conflicting as to the appropriate standard of care to be applied by the jury. The pertinent part of the charge is as follows:

Now, with respect to the expert testimony, the standard of care that is established by members of the same profession in the same or similar communities under like circumstances. Now, an orthopedic surgeon, I instruct you, as far as the foot is concerned, is the same as a podiatrist. It follows, therefore, that the only way you may properly find that the standard in the first allegation has not been met is through evidence presented by Dr. McCollum who was an orthopedic surgeon, or through the defendant himself, or his witness, the other podiatrist from Goldsboro.

Plaintiff argues that the holding of *Hardee v. York*, 262 N.C. 237, 136 S.E. 2d 582 (1964) necessitates a finding of prejudice by this Court as a result of these conflicting instructions.

We agree with plaintiff that the instructions were conflicting but we do not agree that prejudice to plaintiff resulted. Unquestionably, the trial court was instructing the jury on one hand that the standard of care of a podiatrist must be established by other podiatrists and, on the other hand, by an orthopedic surgeon. In light of our earlier holding, equating the standard of care between the two professions was error. However, the error was in plaintiff's favor, not to his prejudice. The instruction that defendant was subject to the high standards of an orthopedic surgeon could only serve to lighten plaintiff's burden for Dr. McCollum testified that defendant's surgical procedure was inadequate. Still, the jury found that defendant had met the higher, though unrequired, standards of orthopedic surgery and returned a verdict against the plaintiff. Not only was the error in the instructions not prejudicial to plaintiff, it was beneficial to him. This assignment of error is overruled.

We have reviewed plaintiff's remaining assignments of error and find them devoid of merit.

In the trial below, we find

No error.

Judges VAUGHN and CLARK concur.