0246

Patsy BOTEHLO, Appellant, v. Blair M. BYCURA, Respondent.

(320 S. E. (2d) 59)

Court of Appeals

*John C. Hayes, III* of *Hayes, Brunson & Gatlin,* Rock Hill, *for appellant.*

*John L. Choate* of *Nelson, Mullins, Grier & Scarborough,* Columbia, *for respondent.*

Heard March 19, 1984.

Decided Aug. 30, 1984.

BELL, Judge:

Patsy Botehlo brought this negligence action against Blair Bycura, a podiatrist, alleging professional malpractice. The issues joined were (1) whether Bycura exercised reasonable care in performing foot surgery without first attempting to alleviate Botehlo's problem by conservative management and (2) whether he breached a duty to inform Botehlo of the nature and risks of the surgery, including healing time, before obtaining her consent to the procedure. The circuit judge granted Bycura's motion for summary judgment on the ground that Botehlo failed to present expert testimony on

either issue and Bycura was therefore entitled to judgment as a matter of law. Botehlo appeals. We affirm.

The material facts are largely undisputed. Botehlo suffered from a painful callus on the sole of her left foot. The callus had been there for about thirty-five years, but she had never sought medical treatment for the problem. In April 1980, she went to Bycura, a licensed podiatrist who practices in Rock Hill. After examining Botehlo and x-raying her foot, Bycura diagnosed her as having an intractable plantar keratoma, that is, a callus on the sole of her foot which would not go away. He told her the second and third metatarsals of the left foot were sitting lower than the others. These bones exerted a downward pressure which caused the callus and her painful symptons. He told her the condition could be corrected by a surgical procedure which involves fracturing the bones and putting them back in place. He also told her she could wear a wide shoe as an alternative to surgery. Botehlo indicated she wanted the surgery and asked Bycura to perform it that same day. Bycura agreed.

With the assistance of a nurse, Botehlo then filled out and signed three written forms. One was a fee schedule indicating the cost of the operation. Another was a diagram of the left foot illustrating which bones would be fractured during the surgery. This form indicated the operation involved "bone fracture" and "bone removal." It listed healing for the operation as:

85% - 3 mos.
95% - 9 mos.
100% - at least 1 year.

It is also listed complications and dangers of the surgery. Botehlo signed and dated this form in a blank immediately to the right of the list of healing times.

The third form was an authorization for and consent of surgery. It contained a detailed list of complications that might occur as a result of the surgery. On the reverse side it listed seven alternatives instead of surgery. These included seeking a second opinion. Botehlo indicated on the form she did not wish to seek a second opinion. She signed the consent form on the front and the back. Before she signed it, a description of the operation ("Bone fracture Bone removal 2d & 3d

metatarsals left foot") was written immediately below the space for her signature on both the front and back of the form.

After Botehlo signed these forms, Bycura returned and performed the operation, called an osteotomy, on the second and third metatarsals of her left foot. As a result of the operation Botehlo experienced pain, swelling, discoloration, and other discomfort. Because her foot hurt, she had difficulty sleeping at night for several weeks. Although she was able to return to her regular desk job the second day after the surgery, for three months she was unable to return to her parttime job as a sales clerk at a pharmacy, because she could not stand on her foot for any length of time without pain. She testified that her second and third toes no longer moved like the others, that she sometimes had shooting pains in her foot, and that she wished her foot was back the way it was. She felt Bycura had misled her about the amount of pain and disability she would suffer from the operation.

After returning to Bycura's office once to have her surgical dressing changed and once to have her stitches removed, Botehlo failed to keep any further postoperative appointments with Bycura. The purpose of the additional appointments was to fit her with an orthotic device to be worn in her regular shoes. This was supposed to relieve pressure on her foot and reduce the possibility of transfer lesions, i.e., the reappearance of calluses on another part of her foot. Instead of returning to Bycura, she consulted an orthopaedic surgeon. Dr. Robert M. Scoville, who treated her for a period of about six months. According to her own testimony, Botehlo told Dr. Scoville:

> ... I would not wear an orthopaedic shoe. I didn't wear one before the surgery and I wasn't going to wear the ugly things now. He did say something about, well, that might help.

In his deposition Dr. Scoville testified that the osteotomies were done in the correct place, that they healed normally, and that there was no question they did take care of Botehlo's plantar keratosis. By the end of September 1980 the callus was gone and weight reduction from the second and third metatarsals had been accomplished. However, Scoville testified he would have tried an oxford shoe with padding and a metatar-

sal bar for six months before considering surgery to correct Botehlo's problem. He agreed that this conservative course of treatment might not have alleviated Botehlo's preoperative problem and that surgery might have been necessary anyway.

## I.

The first issue on appeal is whether Botehlo was required to offer expert testimony on the issue of Bycura's failure to use conservative management before performing surgery.

In a medical malpractice action the plaintiff must ■■ establish by expert testimony both the required standards of care and the defendant's failure to conform to the standard, unless the subject matter lies within the ambit of common knowledge or experience, so that no special learning is needed to evaluate the defendant's conduct. *See Burke v. Pearson*, 259 S. C. 288, 191 S. E. (2d) 721 (1972); *Welch v. Whitaker*, 317 S. E. (2d) 758 (S. C. App. 1984). The reason for requiring expert testimony is that matters of proper diagnosis and treatment ordinarily involve technical knowledge beyond the ken of laymen. *See Bessinger v. DeLoach*, 230 S. C. 1, 94 S. E. (2d) 3 (1956). Thus, on a defendant's motion for summary judgment, there will usually be no genuine issue of material fact unless the plaintiff presents expert testimony on the standard of care and its breach by the defendant. *See Sheppard v. Kimbrough*, 318 S. E. (2d) 573 (S. C. App. 1984).

The disputed issue in this case is whether Bycura's decision to perform surgery violated the professional standard of care required of podiatrists. A decision to perform surgery involves medical judgment outside the realm of lay knowledge or experience. Therefore, expert testimony would normally be required.

Botehlo argues, however, that expert testimony was unnecessary, because Bycura himself admitted he deviated from the standard of care laid down by a recognized authority in the podiatric field. She claims this creates an exception to the normal rule requiring expert testimony. We find the evidence upon which Botehlo relies does not support her position.

During Bycura's deposition, Botehlo's lawyer examined him using an article from the *Journal of Foot Surgery* co-authored by Dr. Joseph B. Addante. Bycura admitted Addante's writings are authoritative in the field of podiatry. The

article discussed the metatarsal osteotomy as a means of treating painful intractable plantar keratosis. One part of the article stated: "In considering use of this procedure [i.e., the metatarsal osteotomy] biomechanical management should be tried first. Surgery is considered if the biomechanical management is not enough to render the patient comfortable." When asked if he agreed with this statement, Bycura said, "With reservations, I agree with it." In response to further questioning, Bycura explained that the statement did not apply to all cases. He believed the statement was not valid in Botehlo's case when the problem had lasted over thirty years. In his judgment, after thirty years Botehlo's problem would not go away with conservative management.

This testimony cannot fairly be characterized as an ██ admission by Bycura that he deviated from the standard of care required of a podiatrist treating Botehlo's problem. The Addante article was not competent evidence of the standard of care required of podiatrists in the circumstances. *See Edwards v. Union Buffalo Mills Co.*, 162 S. C. 17, 159 S. E. 818 (1931) (medical treatise not competent evidence even though author is a standard authority on the subject). Therefore, the article itself could not be relied on to create the material issue of fact which would preclude summary judgment. *See* Rule 44(d), Rules of Practice for the Circuit Courts of South Carolina (motion must be opposed by such facts as would be admissible in evidence). Moreover, Bycura did not agree the statement quoted from the article represented the professional standard to be observed in a case like Botehlo's. As he made no such admission, his own testimony did not create an exception to the rule that the plaintiff must present expert testimony on the issue of malpractice to survive a defendant's motion for summmary judgment.

II.

Since expert testimony was required, the next issue is whether Dr. Scoville, an orthopaedic surgeon, could testify as an expert regarding the standard of care to be observed by a podiatrist. This is a question of first impression in South Carolina.[1]

---

[1] The courts of other states have addressed the question in different ways. In *Dolan v. Galluzzo*, 77 Ill. (2d) 279, 396 N. E. (2d) 13 (1979), the Supreme

Podiatry is a recognized profession in South Carolina. ■ *See* §§ 40-51-10 to -270, Code of Laws of South Carolina, 1976, as amended. The duty and liability of a podiatrist correspond to those of health care professionals generally. The law requires a podiatrist to use reasonable care in the performance of professional services and to act according to his best judgment in treating his patients, but he is only bound to possess and exercise that degree of skill and learning which is ordinarily possessed and exercised by similarly situated members of his profession in good standing. *Cf., Bessinger v. DeLoach*, 230 S. C. 1, 94 S. E. (2d) 3 (1956) (dentists). In other words, the podiatrist's duty of care must be measured by the practices and principles of the particular branch of the healing arts in which he is trained and licensed. He is not bound to possess and exercise the degree of skill and learning required of a physician or surgeon. *Whitehurst v. Boehm*, 41 N. C. App. 670, 255 S. E. (2d) 761 (1979). When a patient chooses a practitioner of a recognized branch of the healing professions, he elects to undergo the kind of care and treatment common to that particular profession. He cannot afterward complain that the care he received fell short of the standards in another profession. *Id.* For this reason, Botehlo had to present evidence on the standard of care required of podiatrists, not physicians and surgeons.

The standard of care in podiatry must be established by ■ the testimony of one knowledgeable or skilled in podiatric practice. *Cf., Whitehurst v. Boehm, supra.* To be competent as an expert, a witness must have acquired by

---

Court of Illinois held that to testify on the standard of care in podiatry, the witness must be licensed to practice podiatry. Thus, an orthopaedic surgeon was not competent to give expert testimony against a podiatrist. In contrast, the Georgia Court of Appeals in *Sanford v. Howard*, 161 Ga. App. 495, 288 S. E. (2d) 739 (1982), permitted such testimony where the witness was knowledgeable in the procedure used by the podiatrist and the method of treatment was the same in both professions. In *Whitehurst v. Boehm*, 41 N. C. App. 670, 255 S. E. (2d) 761 (1979), the court held the applicable standard of care for podiatrists and other "allied occupations" to medicine must be established by other practitioners in the particular field of practice or by other expert witnesses equally familiar with and competent in that field. An orthopaedic surgeon was found not to have the knowledge required to qualify as an expert on the podiatric standard of care. Similarly, in *Darby v. Cohen*, 101 Misc. (2d) 516, 421 N. Y. S. (2d) 337 (N. Y. Sup. 1979), a New York court ruled that a general surgeon was not competent to testify as to standards of podiatric care.

reason of study or experience or both such knowledge and skill in a business, profession, or science that he is better qualified than the jury to form an opinion on the particular subject of testimony. *Hopkins v. Comer*, 240 N. C. 143, 81 S. E. (2d) 368 (1954); *Sandford v. Howard*, 161 Ga. App. 495, 288 S. E. (2d) 739 (1982). The test is a relative one, depending on the particular witness's reference to the subject; an expert is not limited to any class of persons acting professionally. *Memorial Hospital of Alamance County, Inc. v. Brown*, 50 N. C. App. 526, 274 S. E. (2d) 277 (1981); *cf., State v. Merriman*, 34 S. C. 16, 12 S. E. 619 (1891) (not necessary for witness with medical training and experience to be regularly licensed to practice medicine to qualify as expert); *Hill v. Carolina Power & Light Co.*, 204 S. C. 83, 28 S. E. (2d) 545 (1943) (physician not incompetent to testify as an expert merely because he is not a specialist in the particular branch of his profession involved); *Daniels v. Bernard*, 270 S. C. 51, 240 S. E. (2d) 518 (1978) (chiropractor competent to testify as medical expert to extent of his knowledge and experience); *Avret v. McCormick*, 246 Ga. 401, 271 S. E. (2d) 832 (1980) (nurse competent to testify in medical malpractice action against physician as to standard of care in keeping sterile a needle used to draw blood); *Sanford v. Howard, supra* (orthopaedist competent to testify against podiatrist where orthopaedic and podiatric methods of treatment are same and witness has knowledge of procedure used by podiatrist).

The standards of education and licensure for podiatrists are different from those of medical doctors. Compare §§ 40-51-10 to -270, Code of Laws of South Carolina, 1976, as amended, with §§ 40-47-10 to -270, Code of Laws of South Carolina, 1976, as amended. Both Bycura and Dr. Scoville testified that methods of treatment may differ between podiatry and medicine. Both also testified that the procedures for performing a metatarsal osteotomy are different in podiatry and orthopaedic surgery.[2]

---

[2] Bycura testified that the osteotomy he performs is ambulatory foot surgery done in his office on an outpatient basis. He applies a local anesthetic to the foot and makes a quarter inch incision through the top of the foot. He then uses a drill to fracture the metatarsal, saws through it, and raises it. He removes any bone fragments by grinding them to a fine powder with a dental burr. The patient leaves the office the same day. Dr. Scoville testified that his

The circuit judge properly concluded Dr. Scoville was not an expert on the standards of good podiatric practice. Dr. Scoville testified he does not have any training in podiatry, is not licensed in podiatry, and has received no instruction in the practice of podiatry. He was not familiar with any journals, periodicals, or books written by podiatrists. He had never attended any seminars in podiatry. He further testified that he is not familiar with the standards of professional care generally observed by podiatrists, nor the standards of practice of members of the American Academy of Ambulatory Foot Surgeons or the American College of Podiatric Foot Surgeons. Dr. Scoville admitted he had never performed ambulatory foot surgery and that he was not familiar with the surgical procedure Bycura performed on Botehlo. He said he did not know if conservative management was a generally accepted standard for podiatric practice. When asked if he held himself out as an expert, Dr. Scoville answered: "No, not in podiatry. No."

Taking Dr. Scoville's testimony in the light most favorable to Botehlo, as we must in reviewing a summary judgment,[3] it amounts to an assertion that Bycura did not observe the standard of care Dr. Scoville, as an orthopaedic surgeon, would have observed in deciding to perform surgery on Botehlo's foot. Since the material question was not the standard required of orthopaedic surgeons, but the standard required of podiatrists, Dr. Scoville's testimony created no genuine issue of fact for trial. The circuit court was, therefore, correct in granting judgment as a matter of law on the issue of Bycura's failure to attempt conservative management before performing surgery to alleviate Botehlo's problem.

### III.

The final question is whether expert testimony was required on the issue of informed consent. Botehlo alleged that

method of performing an osteotomy requires the patient to be hospitalized three days. He uses different surgicial instruments and makes a wider incision "so you can see what you are doing." If he uses a dental burr he retracts the soft tissues and tendons so they will not be injured by the burr or bone fragments. This is one reason for the larger incision.

[3] *Shea v. State Department of Mental Retardation,* 279 S. C. 604, 310 S. E. (2d) 819 (S. C. App. 1983).

Bycura breached his duty to inform her of the consequences of foot surgery before obtaining her consent to the procedure. However, she presented no expert testimony on the standard of care required of podiatrists in disclosing the nature and risks of a metatarsal osteotomy prior to obtaining consent to perform the procedure. In veiw of this lack of expert testimony, the circuit judge found it unnecessary to decide whether Botehlo gave her informed consent to the operation and entered summary judgment against her.

Our recent decision in *Hook v. Rothstein*, 316 S. E. (2d) 690 (S. C. App. 1984), disposes of this issue. In *Hook* we held the scope of physician's duty to disclose is measured by those communications a reasonable medical practitioner in the same branch of medicine would make under the same or similar circumstances. Because disclosure is an integral part of the physician's diagnosis and treatment of his patient and because the reasonableness of a disclosure often involves questions of medical knowledge and judgment, we determined the plaintiff in a malpractice action against a physician must ordinarily establish a breach of the duty to disclose by expert testimony. *Id.* We now hold this same rule applies in a malpractice action against a podiatrist.

Because Botehlo presented no expert testimony on the standard of disclosure a reasonable podiatrist would be required to meet under the circumstances of her case, the trial judge was not obliged to enquire further into the facts of her informed consent claim. We note, however, that the disclosures Bycura actually made to her, both orally and on the written forms she signed, were full and appear to cover all ill effects of the surgery of which she later complained.

The judgment of the circuit court is

Affirmed.

SANDERS, C. J., and SHAW, J., concur.