Plaintiff/appellant Mary Ann Wozny appeals from an order granting summary judgment in favor of R.D. Godsil, M.D.; the East Alabama Health Care Authority d/b/a The East Alabama Medical Center; Orthopaedic Clinic of East Alabama, P.C.; and Marvin Powell, M.D. We affirm in part, reverse in part, and remand.
On November 21, 1981, Wozny injured her left ankle while playing racquetball. Unable to walk, she was taken to the East Alabama Medical Center (Medical Center) where she was examined by Dr. Marvin Powell. After X-rays were taken, Powell diagnosed Wozny's injury as a sprained ankle, although Wozny asserts that she told Powell that she was afraid she had ruptured her Achilles' tendon. Powell wrapped her ankle with an Ace bandage and told her to see an orthopaedic surgeon if her ankle did not improve. It did not improve, and on January 29, 1982, Wozny saw Dr. Raymond Godsil, an orthopaedic surgeon. Godsil diagnosed Wozny's injury as a torn Achilles' tendon, and, on February 8, 1982, Godsil surgically repaired the tendon at the Medical Center.
Two days after surgery, Wozny began experiencing pain caused by the cast that had been put on post-operatively. An employee of Godsil changed the cast, but did not inspect the operative site. Wozny saw Godsil two weeks after being discharged from the hospital. During this follow-up examination, Godsil inspected the operative site and noticed that an infection had developed. The cast was changed and Keflex, an antibiotic drug, was prescribed. When Wozny returned 10 days later, Godsil examined her ankle and told Wozny that, due to the worsening of the infection, she would need further surgery. Wozny refused to allow Godsil to perform the surgery and instead went to the University of Alabama at Birmingham Medical Center, where she underwent extensive remedial surgery. Wozny claims that, as a result of the defendants' treatment of her injury, she is disfigured and so disabled that she has had to discontinue her veterinary practice with large animals.
On July 9, 1982, Wozny filed an action against Godsil,[1]
Powell, and the Medical Center, claiming negligence in their individual and collective treatment of her injury. All defendants filed motions for summary judgment supported by affidavits. In response to the motions, Wozny filed her own affidavit as a doctor of veterinary medicine, in which she contended that the defendants failed to exercise the proper standard of care in their treatment of her. Later, after experiencing difficulty in obtaining the affidavit of a physician, Wozny also submitted the affidavit of Dr. Peter E. *Page 1080 
Johnston, a doctor of osteopathy, in opposition to the defendants' motions for summary judgment. The trial court granted the defendants' motions, stating:
 "The question of whether a witness is qualified to render expert testimony rests with[in] the sound discretion of this Court. This Court has considered the matter and the particular facts and circumstances of this case and holds in this case that neither the veterinarian nor the osteopath, neither one being a practitioner of the same school of medicine as the defendants in this case is qualified to render expert testimony with respect to the applicable standard of care owed by any of these defendants in this case. Consequently, the Court holds that the plaintiff has failed to offer or introduce a scintilla of evidence in opposition to the Motions for Summary Judgment and Motions are therefore due and hereby are granted." (Emphasis added.)
The primary issue presented by this appeal is whether or not the trial court abused its discretion in determining that, because a doctor of osteopathy is not a "practioner of the sameschool of medicine as the defendants in this case," he is unqualified, as a matter of law, to render expert testimony with respect to the applicable standards of care owed the plaintiff by any one of the defendants.
 I.
The practice of osteopathy, in conjunction with the practice of medicine, is recognized and generally defined in Code of 1975, § 34-24-50, as follows:
"The `practice of medicine or osteopathy' means:
 "(1) To diagnose, treat, correct, advise or prescribe for any human disease, ailment, injury, infirmity, deformity, pain or other condition, physical or mental, real or imaginary, by any means or instrumentality;
 "(2) To maintain an office or place of business for the purpose of doing acts described in subdivision (1), whether for compensation or not;
 "(3) To use, in the conduct of any occupation or profession pertaining to the diagnosis or treatment of human disease or conditions, the designation `doctor,' `doctor of medicine,' `doctor of osteopathy,' `physician,' `surgeon,' `physician and surgeon,' `Dr.,' `M.D.' or any combination thereof unless such a designation additionally contains the description of another branch of the healing arts for which a person has a license."
Generally, in order to overcome a defendant/physician's motion for summary judgment in a medical malpractice case, the plaintiff must submit competent expert medical testimony to prove that the defendant violated the standard of care set out in Code of 1975, § 6-5-484:
 "(a) In performing professional services for a patient, a physician's, surgeon's or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill and diligence used by hospitals generally in the community." (Emphasis added.)
As a general rule, a physician of one school of medicine is incompetent to testify in a malpractice case against a physician of another school of medicine. This rule is stated at 61 Am.Jur.2d, Physicians and Surgeons, etc., § 353, p. 516 (1981):
 "Generally speaking, physicians of one school are regarded as incompetent to testify in malpractice actions against physicians of other schools, and it has been held that the defendant in a malpractice action is entitled to the testimony of competent practitioners of his own school of medicine as to the teachings of that school and his conformity thereto in his treatment of his patient, on the issue of whether he exercised the requisite degree of skill and care in such treatment." *Page 1081 
An exception to this general rule is recognized in this same paragraph from 61 Am.Jur.2d, supra:
 "This rule does not, however, exclude the testimony of physicians of other schools or experts in other lines when that testimony bears on a point as to which the principles of the two schools concur, such as matters of diagnosis, the methods and dangers of the use of X-ray or other electric or mechanical appliances in common use by the several schools, or the existence of a condition that should be recognized by any physician of any school. There is authority, however, which emphasizes the point that the tenets and standards of treatment which form the premises for the testimony must be so substantially the same on the point in issue as to afford a true test. . . ." (Emphasis added.)
At the outset, we note that Wozny makes no arguments with respect to her own affidavit as a doctor of veterinary medicine. She does contend, however, that the affidavit of Dr. Johnston is sufficient to bring this case under the exception set out above, because his affidavit establishes that not only has Dr. Johnston had extensive orthopaedic surgical experience, but also that the methods of diagnosis, treatment, and procedures used in the treatment of an Achilles' tendon rupture, as testified to by Powell and Godsil, are the same as that Dr. Johnston would use. The affidavit of Dr. Johnston is, in pertinent part, set out below:
 "My name is DR. PETER E. JOHNSTON. I am a Doctor of Osteopathy, and my professional background includes the following training and associations:
 "I have a Bachelor of Science Degree from St. Lawrence University in Canton, New York. I have a Doctor of Osteopathy Degree from Philadelphia College of Osteopathic Medicine, which I received in 1959. I took my internship and residency training in orthopedic surgery at Doctors Hospital in Columbus, Ohio. I am a Diplomat of the American Osteopathic Board of Surgery and a Fellow of the American College of Osteopathic Surgeons as well as a Fellow of the American Osteopathic Academy of Orthopaedics. I am Past President of the Columbus Academy of Osteopathic Medicine; a past member of the Intern Training and Selection Committee of Doctors Hospital in Columbus, Ohio; Past Chairman of the Residencey Evaluating Committee of Doctors Hospital; Past Secretary/Treasurer of Doctors Hospital Medical Staff; President of the Doctors Hospital Medical Staff; Chairman, Department of Orthopaedic Surgery from 1975 to 1976 in Doctors Hospital; a member of the American Osteopathic Association; a member of the Ohio Osteopathic Association; a member of the Columbus Academy of Osteopathic Medicine; and a Clinical Associate Professor of Surgery at the College of Osteopathic Medicine at Ohio University. I am a past member of the Medical Administrative Committee, the Arthritis Foundation, Central Ohio Chapter; the Past President of the Board of Trustees of the Southwest Community Health Centers, Inc. in 1983; and I am Chairman of the American Osteopathic Board of Orthopaedic Board of Orthopaedic Surgery from 1979 to the present. I am a member of the Board of Directors of the Alumni Association of Philadelphia College of Osteopathic Medicine, and I am a member of the Board of Trustees of Doctors Hospital in Columbus, Ohio, where I am now actively engaged as an Osteopath in the practice of orthopaedic surgery.
 "In the diagnosis and treatment of ruptures of the Achilles Tendon, and in the prevention and treatment of infections which may occur as a result of surgical intervention in such treatment, the standards of the practice of Osteopathy and medicine are the same. There are no material differences between the two schools that would make any difference in the diagnosis and treatment of a ruptured Achilles Tendon or in the standards or methods employed by medical doctors or osteopaths in infectious processes. The *Page 1082 standards of skill in diagnosis and treatment by doctors of medicine are identical to those of doctors of osteopathy in such situations.
 "As a result of my study, training and experience, I believe that I know that degree of care, skill and diligence which reasonably competent physicians in the fields of emergency room medicine and orthopaedic surgery exercise in the national medical community in the diagnosis and treatment of ruptures of the Achilles Tendon and in the prevention and treatment of infections which may follow surgical repair of such ruptured tendons.
 "I have examined and professionally seen MARY ANN WOZNY, who I understand is a plaintiff in a lawsuit pending in the Circuit Court of Lee County, Alabama, wherein she is seeking damages arising out of her treatment for a ruptured Achilles Tendon which allegedly occurred on or about November 21, 1981.
 "In reference to the said MARY ANN WOZNY and for the purposes of this affidavit, I assume the following set of facts to be true.
 "[The facts, as substantially set out above in the opinion are omitted as stated in the affidavit.]
 "Assuming the above facts to be true, I am of the opinion that the failure of the emergency room physician to diagnose a ruptured Achilles Tendon and his failure to immediately refer Ms. Wozny to a specialist qualified to treat ruptured Achilles Tendons proximately contributed to the necessity of later surgical intervention for the repair of the tendon and the foreseeable result that surgical intervention could lead to infection. It is universally recognized that surgical repair of a ruptured Achilles Tendon, as opposed to treatment by closed-casting, increases the risk of subsequent infection and the risk of loss of soft tissue coverage. I am also of the opinion that the disfigurement which Ms. Wozny presently suffers is a result of an infectious process which resulted from surgical intervention to repair the ruptured Achilles Tendon. It is further a matter of common knowledge among practitioners of the healing arts that if Achilles Tendon repairs must be treated by surgical means, such procedures should be undertaken as soon as possible following the injury.
 "Based upon the above assumptions, I am of the opinion that the emergency room physician at the East Alabama Medical Center in Opelika, Alabama, did not afford Ms. Wozny the degree of care, skill and diligence which reasonably competent physicians in the field of emergency room medicine exercise in the national medical community in the diagnosis and treatment of her ruptured Achilles Tendon, and that such failure proximately contributed to the present condition of her lower extremities.
"[Further statements of the facts are omitted.]
 "In my opinion, based upon the foregoing assumptions, the orthopaedic surgeon treating Ms. Wozny did not afford to Ms. Wozny the degree of care, skill and diligence which reasonably competent orthopaedic surgeons exercise in the field of orthopaedic surgery in the national medical community in the prevention of infection following her surgery or in the management and treatment of the infection after the same became evidence, and that such failure proximately contributed to the disfigurement and permanent disability from which Ms. Wozny now suffers.
 "This failure of due care is evidenced by the following actions or inactions of the orthopaedic surgeon:
 "(1) Failure to have the cast changed as promptly as possible once a decision had been made to change it;
 "(2) Failure of the orthopaedic surgeon to recognize and appreciate the much higher risk of infection present in Ms. Wozny's case due to the surgical site and the extent of the injury as revealed by the surgery and to take appropriate steps to monitor and prevent infection, as well as loss of soft tissue coverage; *Page 1083 
 "(3) Failure of the orthopaedic surgeon to inspect the operative site at the time the cast was changed;
 "(4) The initiation of antibiotic therapy in the form of Keflex without the initiation prior to and during such therapy of culture and susceptibility tests as specifically instructed by the manufacturer of the product; and
 "(5) In failing to provide for the close, continued monitoring of the infection following its discovery.
 "While no one of these factors taken alone may be said to have proximately caused Ms. Wozny's present condition, in my opinion, taken together collectively with the failure initially to diagnose the injury, all proximately contributed to the condition from which she now suffers."
Wozny cites several cases from other jurisdictions in which either an osteopath was held competent to testify against a medical doctor or vice versa. In Hundley v. St. FrancisHospital, 161 Cal.App.2d 800, 327 P.2d 131 (1958), the court held that the testimony of an osteopath against a medical doctor was properly admitted into evidence, under the following rationale:
 "The sole expert called by plaintiff was a doctor of osteopathy. He testified that he is a graduate of the College of Osteopathic Physicians and Surgeons, that he has performed many operations of the type here involved, that the standards of skill and treatment by doctors of medicine are `identical' with such standards of osteopaths, and that he is familiar with such standards in the City and County of San Francisco. Appellant contends that this witness was not qualified as an expert, and that it was error to permit him to testify as such. It has been noted that the Board of Osteopathic Examiners issues licenses which `authorize the holders to practice medicine and surgery the same as licensed physicians and surgeons.' . . . In any event, `the qualification of an expert witness is a question for the sound discretion of the trial court and its ruling will not be disturbed upon appeal unless a clear abuse of it is shown.' . . . No such abuse of discretion appears here." (Emphasis added.) 161 Cal.App.2d at 803, 327 P.2d at 133.
In Harris v. Bales, 459 S.W.2d 742 (Mo.App. 1970), the court held that an osteopath was qualified to testify in a malpractice action against a medical doctor for the alleged improper reduction and treatment of a leg bone fracture. The defendant medical doctor in Harris was a general practitioner who practiced all types of surgery, including orthopaedic surgery. The proffered expert was an osteopath with a general practice. The court summarized his testimony as follows:
 "He stated that he was familiar with the standard of care which is ordinarily exercised by the medical doctors in the community of Carrollton, Missouri, and in like communities, with reference to the treatment and repair of broken bones. He was asked a hypothetical question. . . . Responding, Dr. Fetzer expressed his opinion that the operating physician (the defendant) in setting the fracture, failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the medical profession in good standing, practicing in Carrollton or in similar communities. . . ." (Emphasis added.) 459 S.W.2d at 745.
In holding the osteopath was qualified to testify as an expert, the court explained:
 "He was familiar with the procedure followed by both M.D.s and D.O.s in reducing bone fractures. He was testifying as to matters of diagnosis and treatment known to every physician and practitioner of every school in the area. Defendant cites Mann v. Grim-Smith Hospital and Clinic, 347 Mo. 348, 147 S.W.2d 606, in support of his contention that Dr. Fetzer's testimony was not admissible as an expert. We quote from that opinion at page 608, which we regard as against defendant's contention:
 "`* * * In the Cazzell [Cazzell v. Schofield, 319 Mo. 1169, 8 S.W.2d 580] case (where an osteopath testified in a *Page 1084 
case against an M.D.), we reaffirmed the ruling of the Still [Grainger v. Still, 187 Mo. 197, 85 S.W. 1114] case (where M.D.s were allowed to testify against an osteopath) that such a witness was `competent to express an opinion as to matters of diagnosis and to testify to any scientific fact that is, or ought to be, known to every physician and surgeon of every school or system.' * * *" (Emphasis added.)
Wozny also cites Fridena v. Evans, 127 Ariz. 516,622 P.2d 463 (1980), a malpractice case factually similar to the present case. The defendant in Fridena was a doctor of osteopathy (D.O.) and an orthopaedic surgeon, whereas the expert witness
was a medical doctor (M.D.) and an orthopaedic surgeon. Thus, although in an opposite factual framework, the competency issue presented and the arguments made in Fridena are the same as those presented here with respect to defendant Godsil. In holding that the medical doctor was a competent expert witness, the court explained as follows:
 "The witness, Dr. Warren Colton, Jr., testified that he was a medical doctor (M.D.) and an orthopedic surgeon. Dr. Fridena was a doctor of osteopathy (D.O.) and an orthopedic surgeon. Appellants objected to Dr. Colton's testimony on the standard of care applicable to the case because he had received no osteopathic training and he did not know the osteopathic surgeon's standards of training methods. Dr. Colton did, however, testify that he was familiar with the standard of care of practice in the community with respect to orthopedic surgery and that to a reasonable medical probability, the decision and recommendation to do the type of surgical procedure involved fell below the standard of care.
 "In essence the issue is whether the court erred in allowing one orthopedic surgeon to testify as to the standard of care applicable to another orthopedic surgeon, where one was trained as a medical physician and the other as an osteopathic physician.
 "Historically, it has been held that a member of one `school' of medicine is not competent to testify against a member of another school. See annot., 85 A.L.R.2d 1022 (1962). This rule has been eroded in a number of ways, and it has been held that where standards of different schools are or should be the same with respect to a particular condition, experts from such schools should be fungible in terms of their competency to testify regarding those specific standards. See Musachia v. Terry, 140 So.2d 605
(Fla.App. 1962). Here, there has not been shown to exist any material differences between the two schools that would make any difference in the surgical procedure to remedy a disparity in leg lengths. Under the circumstances shown by the evidence there was no error in allowing Dr. Colton to testify as an expert witness on the standard of care for orthopedic surgery to remedy the condition of Mrs. Evans." (Emphasis added.) 127 Ariz. at 520, 622 P.2d at 467.
Godsil and Powell contend that a medical doctor who is charged with malpractice is entitled to have his treatment tested by the rules and principles of his school of medicine, and that only a medical doctor can say what those rules and principles are and when they have been violated. That is, they contend, only a medical doctor can testify as to whether or not another medical doctor failed to exercise the requisite standard of care. Thus, Godsil and Powell maintain that the affidavit of Wozny's expert was properly excluded, as a matter of law, because the affidavit failed to show Dr. Johnston had received any training whatsoever in the school of medicine.
Godsil and Powell also cite cases from other jurisdictions in which, for various reasons, an osteopath was not permitted to testify against a medical doctor or vice versa. In Forthofer v.Arnold, 60 Ohio App. 436, 21 N.E.2d 869 (1938), the Ohio Court of Appeals affirmed the trial court's withdrawal of all of the expert testimony *Page 1085 
given by two osteopaths in a malpractice suit brought against a medical doctor. The Court in Forthofer explained that the trial court excluded their testimony "for the reason that theevidence of said osteopaths did not indicate that theypossessed any knowledge whatsoever as to the standards ofskill, care and diligence exercised by physicians and surgeonsof the school of medicine to which the defendant belonged." (Emphasis added.) 60 Ohio App. at 439, 21 N.E.2d at 871. The Court in Forthofer went on to state the general rule that "the care, skill and diligence exercised by the defendant is to be judged by that standard of ordinary care which ordinarily is exercised by physicians and surgeons of the same school of medicine," but without stating the widely recognized exception. The Court then held that, absent the testimony of the osteopaths, there was "no evidence from which the jury could determine the standard of care, skill and diligence by which the defendant's conduct was to be judged. On that subject there was accordingly a failure of proof." 60 Ohio App. at 439,21 N.E.2d at 871.
Powell cites the case of Bryant v. Biggs, 331 Mich. 64,49 N.W.2d 63 (1951), in which the Supreme Court of Michigan affirmed verdicts directed in favor of the defendant osteopaths, where the plaintiff's principal witness was a licensed physician and surgeon who testified as follows:
 "[T]he witness testified that he was not familiar with osteopathic schools, and that he had no knowledge as to their teachings other than by hearsay. He had never attended any osteopathic clinics, or discussed with osteopathic physicians and surgeons the question as to what constitutes proper pre-operative or post-operative care. He indicated also that he was not familiar with osteopathic literature, and that he had no knowledge of the fundamental concepts of osteopathy or the osteopathic viewpoints of symptomology." 331 Mich. at 69, 49 N.W.2d at 66.
The court in Bryant v. Biggs, supra, quoted the general rule and exception thereto as it is stated at 61 Am.Jur.2d, § 1353, quoted supra, and explained:
 "[P]ractitioners of other schools of treatment, no matter how well qualified by study and experience in their own methods and standards but lacking the requisite knowledge of the specific matter in question, could not competently express opinions." (Emphasis added.) 331 Mich. at 72, 49 N.W.2d at 67.
The court also quoted from an earlier Michigan case, Janssen v.Mulder, 232 Mich. 183, 190, 205 N.W. 159, 1611 (1925), in which it was said with respect to the plaintiff's burden of proof:
 "`It necessarily follows that such proof must be made by one engaged in treatment by similar methods to those employed by defendant.'" (Emphasis added.)
The court in Bryant followed a line of cases includingFrothofer v. Arnold, supra, in which it was shown the expert had either insufficient knowledge of the standards and methodsof treatment of the defendant's school (Sima v. Wright,268 Mich. 352, 256 N.W. 349 (1934), or insufficient knowledge upon which to base his (the expert's) opinion that there were nodifferences in the methods of treatment of the two schools(Bush v. Cress, 181 Minn. 590, 233 N.W. 317 (1930)). The court then concluded:
 "In view of the repeated statements that he had no knowledge of osteopathy or the methods and standards of practice generally of osteopathic practitioners, the conclusion necessarily follows that he was not competent to testify whether the defendants exercised due and proper care, according to the applicable test, in treating Mr. Bryant's ailment and in performing the operation. Obviously the standards of practice which the witness indicated should be followed in such a case were those of his own school and which his own study and experience had persuaded him were correct. In giving his testimony he was not speaking from the standpoint of osteopathic schools or practitioners, nor was he in position to do *Page 1086 
so. . . ." 331 Mich. at 76, 49 N.W.2d at 69.
Powell and Godsil further rely on the case of Caro v. Bumpus,30 Colo. App. 144, 491 P.2d 606 (1971), involving a malpractice action against an osteopath. In that case, the court briefly discussed the exception to the general rule, but held that plaintiff's proffered expert witnesses failed to qualify under that exception:
 "Plaintiffs' principal contention of error is that the testimony of the doctors of medicine was admissible under an exception to the general rule which exception permits a physician of one school of medicine to testify in a malpractice action against a physician of another school where the method of treatment of the school of the defendant is the same as that of the witness.
 "Our Supreme Court has not had occasion to discuss or consider this exception. It appears from the cases collected in the annotation at 85 A.L.R.2d 1022 that the exception is recognized in several jurisdictions. These courts require proof by competent evidence that the methods of treatment are the same for the defendant's school of medicine and the expert witness' school of medicine. This prerequisite foundation has been held established where the defendant himself admits that the treatment would be the same in both schools. See, e.g., Bellheimer v. Rerucha, 124 Neb. 399, 246 N.W. 867. In other cases, the foundation was established by a witness who was an expert in both schools of practice. See, e.g., Hart v. Van Zandt, 399 S.W.2d 791 (Tex.). In other cases, the foundation was established by the testimony of a practitioner of defendant's own school. See, e.g., Welch v. Shaver, 351 S.W.2d 588
(Tex.Civ.App.).
 "In the present case, the plaintiffs were unsuccessful in their attempt to obtain any admission from defendant on cross-examination that the methods of treatment of osteopaths and doctors of medicine who practice proctology are the same. The plaintiffs also called the osteopath who referred Martha Caro to the defendant, and he stated that he did not know whether the methods were the same. Plaintiffs also called as an expert a physician who had studied medicine both in schools of osteopathy and schools of medicine. The trial court, over objection of defendant, ruled that the witness could testify concerning the similarity of the methods of the two schools if he knew. When the question was propounded to the witness, he stated that he did not know whether the methods of the two schools were the same in the field of proctology.
 "Finally, plaintiffs called two doctors of medicine who were experts in the field of proctology. Plaintiffs offered to prove by these witnesses that the methods of treatment for plaintiff's condition are the same for both osteopaths and doctors of medicine. The court rejected this offer of proof. Although both doctors were eminently qualified as doctors of medicine, neither had any formal schooling as osteopaths, and neither had made any particular study of the subject. They were not competent witnesses on the question of whether the methods of practice for the two schools are the same, and they were not competent witnesses against the defendant. . . ." (Emphasis added.) 30 Colo.App. at 147, 491 P.2d at 607-608.
Powell and Godsil also cite Whitehurst v. Boehm,41 N.C. App. 670, 255 S.E.2d 761 (1979), where the court held that an orthopaedic surgeon (medical doctor) was incompetent to testify against a podiatrist, reasoning as follows:
 "Our review of the applicable statutes and the record indicates that the practice of podiatry is a narrowly restricted one. This allied health profession is not at all comparable with the practice of medicine and surgery. The educational requirements for a podiatrist are less demanding than those for physicians and surgeons. See G.S. 90-202.5. The practice is limited to correcting conditions of the foot. It would be highly unlikely that a practitioner in one of these fields would *Page 1087 
be familiar with the training and standards of the other. Indeed, Dr. McCollum testified that he was not familar with the standards of licensing with respect to podiatrists, nor with their standards for professional care and that all his opinions were based on standards for physicians and surgeons. . . .
 "We hold that, in malpractice cases, the applicable standard of care for podiatrists and other `allied occupations' to medicine must be established by other practitioners in the particular field of practice or by other expert witnesses equally familiar and competent to testify with respect to that limited field of practice." (Emphasis added.) 41 N.C. App. at 676, 255 S.E.2d at 766-767.
It is clear from the preceding analysis of the authorities cited to us by both sides that the prevalent and the modern view is to recognize the exception to the general rule, provided there is an adequate showing on the relevant criteria; that is, even if the defendant and the witness are of different schools of practice, the witness may nevertheless be competent to testify on those standards as to which the principles of the schools do or should concur, such as matters of diagnosis or the existence of a condition that should be recognized by any physician. Accord Ashburn v. Fox, 233 So.2d 840
(Fla.Dist.Ct.App. 1970), cert. dismissed, 242 So.2d 873 (Fla. 1971). The cases discussed above also recognize situations in which an expert witness may be competent to testify where he isknowledgeable (by way of either study and training or experience) of the methods and standards of practice (i.e. skill, care, and diligence) exercised by practitioners of the defendant's school, particularly with respect to the diagnosis, treatment, etc., of the specific injury, illness, or ailment involved. We adopt this view, and we, therefore, cannot affirmatively state, as a matter of abstract law, that an osteopathic doctor can never, ipso facto, offer expert testimony in a malpractice case against a medical doctor, regardless of the experience, expertise, etc., of the osteopath or regardless of whether the two schools concur as to the standards and methods of treatment involved.
The qualifications of a proffered expert and the question of whether the two schools do indeed concur in the standards and methods involved are factual determinations. While we recognize that the ultimate question of whether a witness is qualified to render expert testimony in a given case rests within the sound discretion of the trial court, Burroughs Corporation v. HallAffiliates, Inc., 423 So.2d 1348, 1353 (Ala. 1982), we do not believe sufficient facts have been adduced in this case to enable the trial court to properly exercise that discretion. In light of the exception recognized herein, it is necessary, especially in the context of a motion for summary judgment, that a more complete and thorough examination be made of the witness's knowledge and experience, as well as the similarity of the standards, methods of treatment and diagnosis, etc., exercised by practitioners of the defendants' school and the witness's school, with respect to the particular injury in question.
Dr. Johnston, the proffered expert, has furnished sufficient evidence by way of affidavit to create a reasonable inference of his competency as an expert witness against both defendant doctors. Not only has he stated that "[t]he standards of skill in diagnosis and treatment by doctors of medicine are identical
to those of doctors of osteopathy" with respect to plaintiff's injury, but he has also shown that he has had extensive orthopaedic surgical training and expertise as well as selection, training, and supervisory experience as a doctor on the medical staff of a hospital. The defendants, in turn, claim in their affidavits that they exercised the requisite degree of care, skill, and diligence in treating the plaintiff and that Dr. Johnston is not qualified nor competent to render expert testimony against these defendants because he is not a medical doctor. Otherwise, they have made no factual showing of hisincompetency under the criteria relevant to the applicability of the exception recognized herein. *Page 1088 
We preserve, however, the right of the trial court in its discretion to weigh the facts which may be adduced at a later hearing dealing with Dr. Johnston's competency; thus, we do not undertake to rule on that issue at this point. It is yet to be resolved whether, after a further hearing on and examination of the criteria relevant to application of the exception, there is indeed sufficient concurrence between the two schools or whether Dr. Johnston does possess the requisite knowledge.
 II
We next consider the propriety of summary judgment in favor of the Medical Center. In the first amendment to her complaint, Wozny stated a claim against the Medical Center, alleging that it, through its agents, servants, and employees, "negligently allowed and negligently permitted her ankle to become infected, and negligently allowed and negligently permitted the plaintiff to believe she was being properly treated, when in fact, she was not being properly treated and cared for." In the second amendment to her complaint, Wozny added Dr. Powell as a defendant and alleged negligence in his treatment of her while he "was a practicing physician at the Emergency Room of the Medical Center."
The Medical Center contends that it was entitled to summary judgment because Wozny, in opposition to the motion, failed to put forth a scintilla of evidence establishing negligence on the part of the Medical Center or its employees. It further asserts that Powell is not an employee of the Medical Center; rather, that he is an independent contractor hired by the Medical Center to provide emergency room service, but over whom it exercised no control, citing Odess v. Taylor, 282 Ala. 389,211 So.2d 805 (1968). We note, however, that in its motion for summary judgment, the Medical Center failed to raise the issue of Powell's status as an independent contractor. Nor was the issue raised in either the Medical Center's or Powell's answers to Wozny's complaint. Indeed, Powell "admits that on or about November 20, 1981, he was a practicing physician at the emergency room of the Medical Center," with no mention of independent contractor status. Consequently, since the issue of Powell's status as either an employee or an independent contractor was not before the trial court, summary judgment in favor of the Medical Center cannot be upheld on that basis.
Nevertheless, in opposition to the motion for summary judgment, Wozny failed to adduce a scintilla of evidence as supporting a claim of negligence against any other agents, employees, or servants of the Medical Center, and to that extent, summary judgment in favor of the Medical Center was proper.
For the foregoing reasons, the judgment is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
FAULKNER,[2] JONES, ALMON and SHORES, JJ., concur.
[1] Wozny also named as defendant Orthopaedic Clinic of East Alabama, the clinic with which Godsil is associated, but we refer only to defendant Godsil because his alleged negligence is imputed to the Clinic by virtue of his association with it.
[2] Chief Justice Torbert sat for oral argument of this case, but recused himself after its submission. Justice Faulkner, although not sitting at oral argument, has studied the briefs and listened to the tape of oral argument.